AO 243 (Rev. 5/85)

MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District: Southern West Virginia-Huntington | |
|---|---|---|
| Name of Movant: James J. Gormley | Prisoner No. 05787-088 | Case No. 3:98-0152-02 |
| Place of Confinement: F.C.I. - Manchester, Kentucky | | 3:03-0340 |

UNITED STATES OF AMERICA     V.     James Gormley
(name under which convicted)

## MOTION

1. Name and location of court which entered the judgment of conviction under attack

   U.S. District Court for the Southern District of West Virginia

2. Date of judgment of conviction May 3, 2000

3. Length of sentence 97 months, restitution $783,534, forfeiture $1.2 million

4. Nature of offense involved (all counts) #1: Conspiracy:wire fraud, securities fraud & obstruction of justice; #2: Conspiracy: money laundering; #3: wire fraud & aiding and abetting; #6: Money laundering & aiding and abetting; #13: perjury /false statement before a Court.

COPY-The original was filed in the Clerk's Office at Huntington on

APR 18 2003

SAMUEL L. KAY, CLERK
U.S. District & Bankruptcy Courts
Southern District of West Virginia

5. What was your plea? (Check one)
   (a) Not guilty   ☒
   (b) Guilty   ☐
   (c) Nolo contendere   ☐

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   Not applicable.

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury   ☒
   (b) Judge only   ☐

7. Did you testify at the trial?
   Yes ☐ No ☒

8. Did you appeal from the judgment of conviction?
   Yes ☒ No ☐

1074

9. If you did appeal, answer the following:

    (a) Name of court <u>U.S. Court of Appeals for the Fourth Circuit; Supreme Co</u>

    (b) Result <u>Convictions and sentence affirmed; Petition for Certiorari d</u>

    (c) Date of result <u>June 7, 2001; rehearing denied 7/6/01; Cert. denied 4/15/</u>

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?
Yes ☒ No ☐

11. If your answer to 10 was "yes," give the following information:

    (a) (1) Name of court <u>U.S. District Court for the Southern District of W. Va</u>

       (2) Nature of proceeding <u>Motion for a New Trial, based upon Newly Discovere</u>
<u>Evidence, per Rule 33 of the Fed. Rules of Criminal Procedure.</u>

       (3) Grounds raised <u>Exculpatory/impeachment information withheld in violat</u>
<u>of Brady, Giglio, Jencks Act, Agurs, Bagley, Napue v. Illinois</u>
<u>Prosecutorial misconduct, failure to disclose to Court false</u>
<u>testimony by prosecution witnesses Damron and M. Williams;</u>
<u>prosecutors illegally obtained Damron's guilty plea; jurisdicti</u>
<u>problems with the indictment, which omitted elements of offense</u>

       (4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐ <u>Not yet; the Motion remains pending before the Court.</u>

       (5) Result <u>No result as of the date of filing of this Motion; pending.</u>

       (6) Date of result <u>Not applicable – still pending before the Court.</u>

    (b) As to any second petition, application or motion give the same information:

       (1) Name of court <u>None—not applicable.</u>

       (2) Nature of proceeding <u>None—not applicable.</u>

       (3) Grounds raised <u>Not applicable.</u>

(4) Did you receive an evidendiary hearing on your petition, application or motion?
Yes ☐ No ☐  **Not applicable.**

(5) Result____ **Not applicable.**

(6) Date of result **Not applicable.**

(c) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?
(1) First petition, etc.  Yes ☐ No ☐ **Not applicable.**
(2) Second petition, etc.  Yes ☐ No ☐ **Not applicable.**

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

**Not applicable.**

12. State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

CAUTION: If you fail to set forth all ground in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.
(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.
(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: __Grounds for this Motion and supporting facts are__

__set forth on the attached pages, for simplicity and clarity.__

Supporting FACTS (state *briefly* without citing cases or law) _____

B. Ground two: _____

Supporting FACTS (state *briefly* without citing cases or law): _____

C. Ground three: _____

Supporting FACTS (state *briefly* without citing cases or law): _____

D - Ground four:   Grounds for this Motion and supporting facts are

set forth on the accompanying pages, for simplicity/clari

Supporting FACTS (state *briefly* without citing cases or law):

13. If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them:

Grounds not previously presented were not presented because of

ineffective assistance of Counsel by either trial counsel and/or

appellate counsel, which has substantially prejudiced Mr. Gormley

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?
Yes ☒ No ☐

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing   Not applicable.

(b) At arraignment and plea   Mr. Gormley appeared pro se.

(c) At trial   Wilmer "Buddy" Parker, Esq., Atlanta, Georgia (now with a

different firm); S. Ben Bryant, Esq., Charleston, West Virginia

(d) At sentencing   Wilmer "Buddy" Parker, Esq.; S. Ben Bryant, Esq.

(e) On appeal <u>Mark J. Kadish, Esq., 5525 Cross Gate Court, Atlanta,</u>

<u>Georgia 30327; (404) 252-7799.</u>

(f) In any post-conviction proceeding <u>Mr. Gormley is pro se on his Rule 33 Motion</u>

<u>although he has requested that Counsel be appointed.</u>

(g) On appeal from any adverse ruling in a post-conviction proceeding <u>Not applicable.</u>

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?
Yes ☒ No☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☒

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

<u>Not applicable.</u>

(b) Give date and length of the above sentence: <u>Not applicable.</u>

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☒ No ☐

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

Not applicable; Movant is <u>pro s</u>

I declare under penalty of perjury that the foregoing is true and correct. Executed on

April <u>13</u>, 2003
(date)

_____
Signature of Movant

(7)



**U. S. Departme  of Justice**

*United States Attorney*
*Southern District of West Virginia*

*United States Courthouse*                                      *Mailing Addr*
*500 Quarrier Street*                                    *Post Office Box 3*
*Charleston, West Virginia 25301*          *Charleston, West Virginia 25*
*Fax: (304) 347-5104*                                              *(304) 345-2*
                                                                      *1-800-659-8*

April 13, 1998


Wilmer Parker, III, Esquire
Kilpatrick Stockton LLP
Suite 2800
1100 Peachtree Street
Atlanta, Georgia 30309-4530

        Re:  James J. Gormley

Dear Mr. Parker:

        This is to acknowledge receipt of your correspondence concerning James J. Gormley and to correct certain misconceptions about my conversation with Bob Martin.

        First, I did not decline to meet with Mr. Martin about Mr. Gormley.  I did represent to Mr. Martin, however, that there was not much point or interest in meeting to discuss some lesser charge that would allow Mr. Gormley to continue to practice law.

        Second, I did not suggest to Mr. Martin that this office would consider accepting Mr. Gormley's surrender of his law license in lieu of a prosecution.  What I did state was that, based on our investigation, the one thing about which I was certain is that Mr. Gormley should not be practicing law, and that I suspected the most efficient way of accomplishing that was to prosecute Mr. Gormley.

Wilmer Parker, III, Esquire
April 13, 1998
Page Two


    Finally, Phil Wright and I would of course be glad to meet with you and Mr. Martin at any time to discuss a possible resolution of this matter.

Very truly yours,

REBECCA A. BETTS
United States Attorney

RAB:rj

cc: Robert P. Martin, Esquire

U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT
OF WEST VIRGINIA AT HUNTINGTON.

JAMES J. GORMLEY,                    )        CIVIL ACTION
                                     )
                    Movant,          )        NO.:_____
                                     )
vs.                                  )        (Crim.No. 3:98-0152-02)
                                     )
UNITED STATES OF AMERICA,            )
                                     )
                    Respondent.      )
_____)

### JAMES GORMLEY'S MOTION FOR HABEAS CORPUS, PER 28 U.S.C. 2255.

COMES NOW, Movant James J. Gormley, pursuant to 28 U.S.C. section
2255, pro se, an incarcerated Federal prison inmate, and moves that
the Court vacate and set aside his convictions and sentence in the
above-referenced criminal case, on the grounds that the conviction
and sentence are in violation of the Constitution and laws of the
United States, and the Court was without jurisdiction to impose such
convictions and sentence, or the sentence is otherwise subject to
collateral attack.

Because Mr. Gormley is being held in the Special Housing Unit
at F.C.I. - Manchester, Kentucky, where he is locked in a small cell
23+ plus hours per day, without access to Reporters or Shepard's
Citations, he is unable to prepare a proper Memorandum of Law in
support of this Motion at this time, so he is making a skeletal
filing by listing the issues and supporting facts, as best he can
given the limited time he is permitted with a typewriter in the so-
called SHU law library, which contains only selected volumes of the
U.S. Code Annotated, summaries of most (but not all) Supreme Court
opinions since circa 1960 (but not the actual opinions), B.O.P.
Program Statements and a hand full of legal treatises/ horn books.
Mr. Gormley respectfully submits that the B.O.P. is violating his

Constituional right of access to the Courts by denying him sufficient
time to prepare this Motion and a supporting Memorandum of Law, by
denying him access to an adequate law library and typewriter for
preparing his legal papers.  See, Allah v. Seiverling, 229 F.3d 220
(3d Cir. 2000).  Mr. Gormley respectfully requests that he be permitte
to amend this Motion and submit a supporting Memorandum of Law at a
later date.  Mr. Gormley also requests that the Court grant him a
reasonable bond, pending the consideration of his Motion, so that he
can have access to outside legal resorces in preparing his Memorandum
of Law, and because of the strong likelihood, given the issues
presented, that he will prevail on the merits.  This is one of those
rare cases where it is appropriate for the Court to exercise its
inherent authority to grant bond pending resolution of the 2255 Motion
U.S. v. Maher, 10 F.Supp.2d 594 (W.D.Va.1998) (appellate bond case,
addressing what is a "substantial question"); In re: Wainright, 518
F.2d 173 (5th Cir.1975)(Per Curiam); Ostrer v. U.S., 584 F.2d 594,
596 n.1 (2nd Cir.1978); Land v. Deeds, 878 F.2d 318 (9th Cir.1989);
Cherek v. U.S., 767 F.2d 335, 337 (7th Cir.1985); Dotson v. Clark,
900 F.2d 77, 79 (6th Cir.1990); Fonseca v. U.S., 129 F.Supp.2d 1098
(W.D.Mich.2000).  Mr. Gormley also needs time to meet with his former
Counsel, to prepare for the evidentiary Hearing on the 2255 Motion,
and so that he can try to secure affidavits in support of the 2255
Motion and the pending Rule 33 Motion.  Aronson v. May, 13 L.Ed.2d 6, 9
(1964).

   This 2255 Motion primarily breaks down between issues of
ineffective assistance by trial and/or appellate counsel, in violation
of the Sixth Amendment, and issues of denial—violations of Mr. Gormley's
right to Due Process of Law, in violation of the Fifth Amendment.
At the outset, Mr. Gormley incorporates by reference all of the
arguments and cases he has previously cited to the Court in his

Motion for a New Trial, based upon Newly Discovered Evidence, per
Rule 33, as the Motion stands amended.  To the extent that such issues
should have been timely raised by trial counsel and/or appellate
counsel, but were not, they should now be considered in this Motion
as claims of ineffective assistance of counsel, in violation of the
Sixth Amendment, and/or violations of Mr. Gormley's Fifth Amendment
right to Due Process of Law.

Section 2255 makes an evidentiary Hearing mandatory, unless it
is clear from the pleadings, files and records that Mr. Gormley is
not entitled to relief.  Given the nature of the claims raised in
this Motion, an evidentiary hearing will be mandatory.  Raines v.
U.S., 423 F.2d 526, 529 (4th Cir.1970).  Even if the Court vacates
Counts 1, 2, 3 and 6 as jurisdictionally defective, a Hearing will
still be necessary as to Count 13.  U.S. v. Witherspoon, 231 F.3d 923,
CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL.  925-27 (4th Cir.2000)

The Sixth amendment to the U.S. Constitution guarantees all
criminal defendants the right to effective assistance of legal counsel.
McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970).  To prove
ineffective assistance of counsel, Movant must prove both deficient
performance and prejudice.  Lockhart v. Fretwell, 506 U.S. 364, 369
(1993); Strickland v. Washington, 466 U.S. 668, 687 (1984).  To
prove deficient performance, Movant must show, "that counsel made
errors so serious that counsel was not functioning as the counsel
guaranteed to the defendant by the Sixth Amendment."  Id. at 687.
That is, Movant must show that counsel's performance fell below an
objective standard of reasonableness.  Id.at 688.  To prove prejudice,
Movant must show that "there is a reasonable probability that, but
for counsel's unprofessional errors, the result of the proceeding
might have been different."  Id. at 694.   In a 2255 Motion, Movant

bears the burden of proving his grounds of collateral attack by a
preponderance of the evidence. See, Miller v. U.S., 261 F.2d 546, 547
(4th Cir.1958); Vanater v. Boles, 377 F.2d 898, 900 (4th Cir.1967);
U.S. v. Bondurant, 689 F.2d 1246, 1251 (4th Cir.1982); Polizzi v. U.S.
926 F.2d 1311, 1321 (2nd Cir.1991).

ISSUE #1: Trial counsel was ineffective in attempting to put on
a theory of defense for Mr. Gormley that all he had done was practice
law within legally and ethically acceptable boundaries, that he thus
had no criminal intent and never entered into any crimes/conspiracies
with the co-defendants and/or Roger Damron, because trial counsel
(a) failed to offer or present any expert testimony from either Mr.
Gormley or another attorney concerning the acceptable rules and legal
and ethical boundaries for the practice of law; and/or
(b) failed to request or obtain a proper "theory of defense" Jury
Instruction (Instruction 19, which was refused by the Court was not
a legally supportable theory of defense instruction, and Counsel
cited no legal authorities in support of it, or any other such
theory of defense instruction), which would have sketched out Mr.
Gormley's legal and ethical duties as an attorney, and have informed
the Jury that if they believed that Mr. Gormley had only been acting
as an attorney within ac that he had no criminal intent, so they
must acquit him. It also violated Mr. Gormley's Fifth Amendment
right to Due Process of Law that the Court did not sua sponte
fashion and give some jury instruction concerning the theory of
defense offered by trial counsel. A defendant is entitled to an
instruction on his theory of the case if the theory is legally
cognizable and there is some evidence upon which the jury could

rationally find for the defendant. <u>Mathews</u> <u>v.</u> <u>U.S.</u>, 485 U.S. 58, 63 (1988); <u>U.S.</u> <u>v.</u> <u>Hicks</u>, 748 F.2d 854, 857 (4th Cir. 1984)(reversing convictions due to District Court's failure to give an alibi jury instruction); "It is settled law in this Circuit as well as in other Circuits that a defendant is entitled to an instruction submitting to the Jury any theory of defense for which there is some foundation in the evidence. <u>See</u>, <u>e.g.</u>, <u>U.S.</u> <u>v.</u> <u>Mitchell</u>, 495 F.2d 285, 287-88 (4 Cir.1974);" <u>Hicks</u> at 748 F.2d at 857. <u>Accord</u>, <u>U.S.</u> <u>v.</u> <u>Dornhorfer</u>, 859 F.2d 1195, 1199 (4th Cir.1988): "Dornhorfer contends that the District Court erred when it refused to instruct the jury as to his theory of the case. AS long as the instructions have an evidentiary foundation, and are accurate statements of the law, the district court should include instructions 'to instruct the jury in the defendant's theory of ▬▬▬ defense.' <u>U.S.</u> <u>v.</u> <u>Mitchell</u>, 495 F.2d 285, 287-88 (4th Cir. 1974)." Thus, even if Mr. Parker's proposed theory of defense instruction #19 was not acceptable to the Court, nevertheless, Due Process required the Court to formulate and give some theory of defense Instruction, since one was expressly requested. Trial Counsel was then also ineffective for failing to object to the Court's failure to give a theory of defense instruction, and appellate counsel may also have been ineffective for failure to raise this issue on appeal. <u>Evitts</u> <u>v.</u> <u>Lucy</u>, 469 U.S. 387, 396 (1985); The <u>Strickland</u> <u>v.</u> <u>Washington</u> standard applies to a defendant's claim that his appellate counsel was ineffective. <u>Smith</u> <u>v.</u> <u>Robbins</u>, 528 U.S. 259, 285 (2000); <u>Smith</u> <u>v.</u> <u>Murray</u>, 477 U.S. 527, 535-36 (1986); <u>U.S.</u> <u>v.</u> <u>Cross</u>, 308 F.3d 308, 315 (3rd Cir. 2002), and notes 11 & 12; <u>U.S.</u> <u>v.</u> <u>Cook</u>, 45 F.3d 388, 394-95 (10th Cir.1995) (Omission of a "dead-bang winner" issue by appellate counsel who presented strong

but unsuccessful claims on direct appeal is still ineffective
assistance).  In this case appellate counsel presented strong issues
on direct appeal, but failed to raise the issue of the Court's
failure to give a theory of defense instruction, which would have
been a "dead-bang winner", even on a plain error standard of review,
since trial counsel failed to object and properly preserve the issue
for a more favorable standard of review.  U.S. v. Douglas, 818 F.2d
1317, 1320-23 (7th Cir. 1987) (Convictions reversed: Trial court's
failure to give a "buyer&seller" jury instruction in a drug conspiracy
case was plain error in violation of the defendant's right to Due
Process of Law under the Fifth Amendment), U.S. v. Horton, 921 F.2d 5
U.S. v. Hastings, 134 F.3d 235, 239(4th1998).546-47 (4th Cir. 1990).
The extraordinary importance of the Jury receiving a theory

of defense jury instruction is most eloquently expressed as follows:

> " While 'reversible error' from a strictly semantic stand-
> point, could mean reversible 'per se' or reversible only if
> error resulted, or could have resulted in some prejudice to
> the defendant, our cases must be read as meaning that a failure
> to instruct the jury on the defendant's theory of the case is
> reversible per se. The right to have the jury instructed as to
> the defendant's theory of the case is one of those rights 'so
> basic to a fair trial' that failure to instruct where there is
> evidence to instruct support the instruction can never be
> considered to be harmless error. Jurors are required to apply
> the law as it is explained to them by the trial judge.  They
> are not free to conjure up the law themselves.  Thus, a failure
> to instruct the jury regarding the defendant's theory of the
> case precludes the jury from considering the defendant's defense
> to the charges against him. Permitting a defendant to offer a
> defense is of little value if the jury is not informed that the
> defense, if believed, or if it helps create a reasonable doubt
> in the jury's mind, will entitle the defendant to a judgment
> of acquittal.
> We conclude that our cases -- both before and after Chapman
> (v. California, 386 U.S. 18, 24 (1967)) -- stating that the
> failure to instruct the jury on the defendant's theory of the
> case is 'reversible error' means that the error can never be
> treated as harmless. ... (A)ny substantial modification of the
> rule would be inconsistent with fundamental Constitutional
> guarantees.  ...  REVERSED AND REMANDED."

U.S. v. Escobar De Bright, 742 F.2d 1196, 1200-1202 (9th Cir. 1984).

Based upon the foregoing authorities, there can be no doubt but that

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

UNITED STATES OF AMERICA          :
                                  :
        v.                        :          Criminal No. 3:98-00152-02
                                  :
JAMES GORMLEY                     :

### DEFENDANT'S JURY INSTRUCTION NO. 19.

(Theory of Defense)

It is Defendant Gormley's theory of defense that, at no time, did he ever commit, or intend to commit, any of the crimes charged in the Indictment. Rather, Mr. Gormley submits that, at all times, he was acting in his professional capacity as a lawyer, vigorously representing and providing legitimate legal services to his clients in good faith and doing what he honestly believed to be in the best interest of his clients within the bounds of the law.

[Mark] — Judge Chambers refused to give this Theory of Defense Jury Charge (which is unsupported by legal authorities or citations, as presented), but Buddy didn't proffer another Theory of Defense Charge and Judge Chambers didn't craft one either. I believe this was ineffective assistance by Buddy, which caused me substantial prejudice. Jury couldn't acquit me because they weren't[43] instructed on my Theory of Defense. Exclude [?]

ATLLIB01 914871.1 08/08/99 1:31 PM

the Court violated Mr. Gormley's Fifth Amendment right to Due Process
of Law by failing to fashion and give a jury instruction concerning
Trial Counsel's theory of defense, "just practicing law", even though
the Court found Mr. Parker's proposed instruction #19 unacceptable.
Further, Mr. Parker was ineffective because he failed to present a
proper theory of defense instruction, supported by legal authorities
and/or expert testimony. He also failed to object to the Court's
failure to give a theory of defense instruction, to properly preserve
the issue for appeal, even though the error does qualify for "plain
error" treatment, since it is reversible per se. Appellate counsel
Mark J. Kadish was ineffective for failing to raise this issue on
direct appeal, since it is a "dead-bang winner". Mr. Gormley was
severely prejudiced as a result of these errors by trial counsel,
and there can be little doubt but that the Jury might have found Mr.
Gormley "not guilty" if they had been properly instruced on his
theory of defense; the result of the case could have easily been
different, since even Judge Chambers acknowledged, in considering
the Motion for a Verdict of Acquittal, that the case was a close one,
and he had difficulty seeing any criminal intent on Mr. Gormley's
part. A proper theory of defense instruction easily could have tipped the
balance, because then the Jury would have known that if they ●
believed Mr. Gormley's theory of defense, they could have found him
"not guilty". U.S. v. Angle, 230 F.3d 113, 119 (4th Cir.2000).

Fourth Circuit law clearly supports the Jury being instructed
about a lawyer defendant's legal and ethical duties, so that the
jury is aware of them in appraising his state of mind, mens rea, intent
In U.S. v. Reamer, the Court upheld jury instructions concerning
the attorney's legal and professional standards of conduct. 589 F.2d
769, 771 (4th Cir. 1978). The Court wrote as follows:

"    Also, on the issue of criminal intent, the Court instructed
that state law and the code of professional conduct prohibit the
solicitation of clients by attorneys, and the standards for
violation of the professional code were read to the Jury.  The
court concluded its charge ▆▆▆▆ with the admonition that
defendant was not on trial for any conduct not alleged in the
indictment.  We think that this instruction was supported by
the evidence and was properly given.  See, U.S. v. Keane, 552
F.2d 534, 553-57 (7th Cir.1975), cert. denied, 424 U.S. 976 (197

Reamer, 589 F.2d at 771.

In U.S. v. Klauber, the Court also affirmed the trial Court's having

given jury instructions concerning the attorney's ethical obligations

611 F.2d 512, 520 (4th Cir.1979).  In that case, the Court said:

"    Klauber further complains about the jury's being informed
of the Maryland barratry statute and of the Code of Professional
Responsibility.  Both were relevant to the attitude Klauber, as
a member of the Bar, should have maintained toward practices tha
were proven.  They were properly admissible. (citing, Reamer)."

Klauber, 611 F.2d at 520.

Several other Circuit Courts have addressed the appropriateness of

instructing the Jury concerning an attorney's legal and ethical

obligations, where the attorney is accused of committing a crime

arising out of his law practice, with his clients.  The Eleventh

Circuit wrote:  "We have previously noted the relevance of ethical

and professional standards of behavior in evaluating criminal
intent.  See, U.S. v. Delucca, 620 F.2d 294, 301 (5th Cir.1980),
cert. denied, 450 U.S. 983 (1981) (citation partially omitted)
...  Other Circuits have also upheld the relevance of profess-
ional standards for attorneys where offered by the Government
to help prove criminal intent on the part of lawyer-defendants.
See, U.S. v. Machi, 811 F.2d 991, 999-1000 (7th Cir.1987);
U.S. v. Klauber, 611 F.2d 512, 520 (4th Cir.1979); U.S. v.
Rabbitt, 583 F.2d 1014, 1028-29 (8th Cir.1978). (citations
partially omitted).  It would be incongruous to admit such
evidence when tendered in support of guilt, but not when
offered for exculpatory purposes."

U.S. v. Kelly, 888 F.2d 732, 743-44 (11th Cir. 1989).

In Kelly, the defendant-attorney's convictions were reversed, since

the evidence was as consistent with an innocent interpretation as it

was with guilt.  See also, U.S. v. Brunn, 809 F.2d 397, 410-411

(Attorney's convictions for conspiracy with his clients and aiding

and abetting reversed because the attorney shared no criminal intent
with the clients.) "Kelly's duty of attorney confidentiality, combined
with his duty to counsel his clients against committing further crimes
forms the basis for his primary defense: that he acted not with
criminal intent but within the legitimate bounds of legal represent-
ation."  888 F.2d at 743.  In Mr. Gormley's case, for example, Mr.
Damron testified that Mr. Gormley counseled him against investing
in Mr. Oles' Program #39, and counseled him against sending a new
list of investors, addresses and amounts to be repaid to Paul Dempsey
in August 1997.  Further, when Mr. Gormley learned that Mr. Damron
had not been candid in disclosing the money he had received from Mr. O
after he was indicted in January 1996, Mr. Gormley advised him that he
must tell the truth to his court-appointed counsel, Edward Weis, Esq.,
which he did; Mr. Weis then fulfilled his ethical obligations
under West Virginia Rule of Professional Conduct 3.3 and disclosed
to the Court that Mr. Damron's monthly accountings had not been
complete or correct.  See also, U.S. v. Shaffer Equipment Company,
796 F. Supp. 938 (S.D.W.Va.1992), aff'd in part, vacated in part, 11
F.3d 450 (4th Cir.1993), on remand, should surprise no one that Mr.
158 F.R.D. 80 (S.D.W.Va. 1994).
Gormley did not disclose the matter directly to the Court himself,
since Mr. Damron was represented by Counsel of record, who was
thoroughly familiar with how to address the matter under Fourth
Circuit and West Virginia law, where Mr. Gormley was not admitted
to practice or familiar with the requirements of the jurisdiction.
In Georgia, where Mr. Gormley practiced, he believes that the Rules
of Professional Conduct would merely have required him to withdraw
from representation, if Mr. Damron had not "come clean" with Mr. Wise.
These differences in legal ethics standards between jurisdictions
were very important to the jury's appraisal of Mr. Gormley's intent.

ABA Model Rule of Professional Conduct 1.6 (2000) states, "A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except that the lawyer may, but does not have to, reveal confidential information (1) to the extent that the lawyer reasonably believes is necessary to prevent the client from committing a criminal act which the lawyer believes is likely to result in imminent death or substantial bodily harm [Economic harm is not identified as a basis for the exception], or (2) to establish a claim or defense by the lawyer in a controversy between the lawyer and the client, or to establish a defense to a criminal or civil charge against the lawyer based on conduct in which the client was involved, or to answer any allegations in any proceeding about the lawyer's representation of the client.

Pursuant to ABA Model Rule of Professional Conduct 1.2(d) an attorney "shall not counsel a client to engage, or assist a client in, conduct that the client knows is criminal or fraudulent,... but the attorney may discuss the legal consequences of any proposed conduct and help the

client make a good faith effort to determine the application of the law to that proposed conduct. Comment 6 to the rule states, "The fact that a client uses advice in the course of action that is criminal or fraudulent does not, of itself, make a lawyer party to the course of action. However, a lawyer may not knowingly assist a client in criminal or fraudulent conduct. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity."

If the attorney learns that his client is involved in ongoing criminal or fraudulent acts, under ABA Model Rule 1.16 (2001),

(a) Except as stated in paragraph (c), a lawyer shall ... withdraw from the representation of a client if: (1) the representation will result in violation of the rules of professional conduct or other law; ...

(b) except as stated in paragraph (c) a lawyer may withdraw from representing a client if: (1) the client persists in a course of action involving the lawyers services that the lawyer

reasonably believes is criminal or fraud-
ulent; (2) the client has used the lawyer's
services to perpetuate a crime or fraud; and
... (c) When ordered to do so by a tribunal,
a lawyer shall continue representation
notwithstanding good cause for terminating
the representation.
(d) Upon termination of representation,
a lawyer shall take steps to the extent
reasonably practicable to protect a
client's interests, such as giving reasonable
notice to the client, allowing time for
employment of other counsel, surrendering
papers and property to which the client
is entitled . . . .

After withdrawal the lawyer must also
refrain from disclosing the client's
confidences except as allowed under
Rule 1.6. Only where "the lawyer has
confidential information clearly establish-
ing that a client is likely to commit a
criminal or fraudulent act that is likely
to result in death or substantial bodily
harm to a person," must he disclose
information adverse to the client; other-
wise, his first obligation is to try to
dissuade the client from continuing in
such conduct

Some of the ethics issues that Mr. Parker

should have requested jury instructions upon

include Rule 3-107 (Canon 7) of the State

Bar of Georgia [the jurisdiction from which

Mr. Gormley was practicing and where he was

licensed], "A lawyer Should Represent a Clie

Zealously within the Bounds of the Law, EC

7-1 [Ethical Considerations]:

"The duty of a lawyer, both to his client
and to the legal system, is to represent the
client zealously within the Bounds of the Lo
which includes Disciplinary Rules and
enforceable professional regulations. The
professional responsibility of a lawyer deriv
from his membership in a profession which ha
the duty of assisting members of the public
to secure and protect available legal right
and benefits. In our government of laws
and not of men, each member of our socie
is entitled to have his conduct judged an

regulated in accordance with the law, to seek any lawful objective through legally permissible means, and to present for adjudication any lawful claim, issue or defense."

The State Bar of Georgia, in EC 7-2, notes that the "bounds of the law in a given case are often difficult to ascertain ... the limits and specific meaning of ... relevant law may be made doubtful by changing or developing Constitutional interpretation, inadequately expressed statutes or judicial opinions, and changing public and judicial attitudes."

The application of conspiracy, money laundering, securities fraud, obstruction of justice and wire fraud statutes to the

conduct of a practicing attorney in advis

his clients is murky and uncertain, as

evidenced by decisions such as <u>U.S. v. Lieb</u>

106 F.3d 393 (Table), 1997 WL 2655

(4th Cir, 1997), <u>Schatz v. Rosenberg</u>, 943

F.2d 485 (4th Cir, 1991), <u>U.S. v. Hollecla</u>

950 F. Supp, 1308, 1313 (S.D.W.Va, 1998)

<u>S.E.C. v. Belmont Reid & Co</u>, 794 F.3d 1388

<u>U.S. v. Kellington</u>, 217 F.3d 1084, 1098-110

(9th Cir 1999), <u>U.S. v. Kloess</u>, 251 F.3d 94

948-49 (11th Cir, 2001), <u>U.S. v. Beckner</u>, 134

F.3d 714, 718-21 (5th Cir, 1998), <u>U.S. v. Kell</u>

888 F.2d 732, 743-44 (11th Cir 1989), <u>U.</u>

<u>Cavin</u>, 39 F.3d 1299, 1308-11 (5th Cir 199

<u>U.S. v. Machi</u>, 811 F.2d 991, 999-1000 (7th Cir

U.S.v. Rabbit, 583 F.2d 1014, 1028-29
(8th Cir. 1978), U.S.v. Casperson, 773 F.2d 2[...]
223-24 (8th Cir. 1985), U.S.v. Klauber, 61[...]
F.2d 512, 520 (4th Cir. 1979), U.S.v. Farrel[...]
126 F.3d 484, 488 (3rd Cir. 1997), and
U.S.v. Davis, 183 F.3d 231, 248 (3rd Cir. 199[...]
See also, Nix v. Whiteside 475 U.S. 157,
175 (U.S. 1986) and U.S.v. O'Hagan, 92 F.3[...]
612, 628 (8th Cir. 1996); and Schlaifer, Na[...]
& Co. v. Estate of Andy Warhol, et al, 927 [...]
F. Supp. 650, 661 (S.D.N.Y. 1996) and
Up. John Co. v. U.S. 449 U.S. 383, 389 (19[...]
(attorney-client privilege case) and In re: Sea[...]
Case, 124 F.3d 230 (D.C. Cir. 1997) (attorn[...]

client and work product privileges), and _Douglas v. Dyn McDermott Petroleum Operating Co.,_ 144 F.3d 364, 369-72 (5th Cir. 1998). Based upon the knowledge Mr. Gormley had at the times described in the Indictment, Mr. Gormley's conduct was with the purview of both 4th Circuit law and Geor[gia] ethical considerations, but counsel never soug[ht] jury instructions about these issues, even though they constituted counsel's theory of defense, as expressly described by Mr. Park[er] in his opening argument to the Jury, Trial tran[script] Vol. II, pp. 28-36. _See further, SEC v.[?] Pinckney,_ 923 F. Supp. 76, 81 (E.D.N.C. 199[6])

[attorneys advise client not to invest in a foreign]

bank debenture trading program, just as
Mr. Goemley advised Messrs. Bollin and Dominm
not to invest in Program #39 or any other
such program, but they disobeyed the legal
advice and did it anyway; attorneys in Pinckne
were not even sued civilly by the S.E.C., muc
less criminally indicted like Mr. Goemley);
West Virginia Code Ann. section 32-4-401
(g)(2); Official Code of Georgia Ann. section
10-5-2 (14) and Section 202 (a)(11)(11) of
the Federal Investment Advisors Act of 19
Trial counsel failed to request jury charges
based upon the preceding case and statutes;
to the effect that as an attorney, Mr. Goemley

was lawfully permitted to give financial and investment advice incidental to his law practice. Such jury instructions would have distinguished Mr. Gormley from some of his obviously guilty co-defendants and reinforced counsel theory of defense, "just practicing law". Mr. Gormley was severely prejudiced by counsel failure to request such as part of a proper theory of defense jury instruction.

EC 7-3 provides the following guidance:

"... a lawyer, serving as advisor primarily assists his client in determining the course of future conduct and relationships... a lawyer should resolve in favor of his client doubts as to the bounds of the law."

EC 7-4 states: "... conduct is within the bounds of the law, and therefore permissible

If the position taken is supported by the law or is supportable by a good faith argument for the extension, modification, or reversal of the law."

On its face, Mr. Gormley's conduct comported with these requirements, but trial counsel failed to request any jury instructions based upon the ECs, to help the jury understand Mr. Gormley's state of mind and intent.

Finally, EC 7-8 cautions that: "a lawyer ought to initiate this decision making process if the client does not do so. Advice of a lawyer to his client need not be confined to purely legal considerations."

From the beginning of his representation of Mr. Damron, Mr. Gormley was cautious about the proposed Program #39. He told Mr. Damron that he had heard of such programs but had

never seen one work, and Gormley refused to give Bollin and Damron a "green light" to proceed with the investment until and unless Mr. Oles and/or Mrs. Holcomb provided due diligence documentation and a bank guarantee, which were never forthcoming. Indeed, because Mr. Gormley refused to draft a contract between the Bollin/Damron Joint Venture and Mr. Oles/Mrs. Holcomb, Mr. Bollin fired Mr. Gormley on Friday, September 22, 1995, and came by Mr. Gormley's law office the next morning, Saturday, to pick up his file and the balance of his retainer. Thereafter, Messrs. Bollin and Damron proceed with "investing" $400,000 in Program #39 by wire-transferring

the money to BCI Corp., which was controlled
by Mr. Raimer. This was done after Mr. Gormley
had been fired, without his knowledge, and against
his legal advice. It was only when the "profits"
failed to materialize by October 15, 1995, as
Mr. Oles had promised, that Mr. Damron called
Mr. Gormley, told him what they had done, and
asked him to try to help him obtain the profits
or recover the $400,000. When Mr. Gormley
asked to see the contract with Mr. Oles, Mr.
Damron told him there was no written contract,
that he and Mr. Bollin had wired the $400,000
based upon an oral promise, since Mr. Bollin
had not hired another attorney after firing Mr.

Gormley. Thus, when Mr. Gormley later stated in December 1995 on a telephone call recorded by the Toumas, that he did not know that much about the deal, he meant that he was not representing Mr. Bollin and Mr. Damron when they made their "oral" deal with Mr. Oles; since there was no written contract to review, the terms of the so-called deal were uncertain to Mr. Gormley. Mr. Damron acknowledge that he never discussed deal #2, for $250,000 or deal #3, for $140,000, with Mr. Gormley. He testified that because Mr. Gormley would not "green light" deal #1, he never asked him to review any other deals, because he believed Mr.

Gormley would not "green light" them either.
When Mr. Damron later wire transferred some
$120,000 of money from the deal #3 to Mr.
Gormley's law firm escrow account, so that
Mr. Gormley could have cashier's checks cut
to the investors, Mr. Damron deceived Mr.
Gormley by telling him the checks were for
monies he owed investors in his Gold Eagle
Club coin business. In a perverse sense,
there was a kernal of truth in Mr. Damron's
statements to Mr. Gormley, since Mr. Damron
had had investors in deal #3 make their
"debenture program investments" by purchas-
7 Gold Eagle Club gold coin contracts;

apparently that was a cover Mr. Damron
invented so that people could invest I.R.A
monies without triggering premature witha
penalties. Gold coins are an acceptable
investment for I.R.A. monies, but unreg
foreign bank debentures are not. I.R.S.F
590. Thus, when Mr. Gormley had cashie
checks cut from money Mr. Damron had ha
transferred into his law firm escrow acc
he believed, based upon what Mr. Damron ha
him, that the money was owed to gold co.
purchasers from Gold Eagle Club, LLC, n
to investors in a foreign bank debenture

Mr. Gormley asserts as part of issue #1 that trial counsel erred by failing to offer expert testimony either from Mr. Gormley or another attorney concerning the theory of defense, including the boundaries of practicing law and legal ethics. This theory of defense may be almost impossible to establish without expert testimony from an attorney, since the rules and ethical constraints under which attorneys practice law are specialized, sometimes counter-intuitive, and beyond the ken of a lay jury. For example, when a lay person is told that a person he has been doing business with has 2 prior convictions for securities fraud and his house has just been

searched by the F.B.I., that person will probably
terminate business and communications and run
away. Mr. Damron told Mr. Gormley about his
prior criminal record after the F.B.I. searched
his house in February 1996. The Government
would argue that Mr. Gormley should then have
"run away" from Mr. Damron too, but that would
have been counter to Mr. Damron's Sixth
Amendment right to Mr. Gormley's legal counsel
and Mr. Gormley's duty of loyalty to his client.
The jury, however, was never charged about
those concepts (counsel did not request such
charges) and no expert attorney witness ever
explained those concepts, which clearly affected

Mr. Gormley's thinking and state of mind.

Since it was trial counsel's theory of defense

that Mr. Gormley was "just practicing law",

he was ineffective for failing to offer expert

testimony in support of it. Two cases illustrate

this point. In <u>U.S. v. Cavin</u>, 39 F.3d 1299

(5th Cir. 1994), the Court reversed the

convictions of an attorney charged with

conspiracy to commit fraud. The Court wrote,

"The lynchpin of Daigle's (the attorney's)
defense was that the Government failed
to prove fraudulent intent. As evidence of
good faith, Daigle offered the testimony
of Moise S. Steeg, Jr., a veteran
commercial lawyer, about the ethical
constraints under which attorneys
operate in the regulatory arena and
about the substance of rental asset

transactions. The district court excluded this testimony. In so doing, the court abused its discretion and committed reversible error."

Cavin, 39 F.3d at 1308.

In U.S. v. Kelly, 888 F.2d 732 (11th Cir. 1989), the attorney defendant sought to testify, and the trial judge was reversed for refusing to permit him to testify, about how his understanding of his professional obligations as an attorney affected his conduct.

"It is true, as the district court observed, that Kelly was not directly charged with failing to perform an act that would itself have violated his professional duties, such as revealing a client confidence. We agree with Kelly, however, that the excluded testimony was very relevant to his

intent and state of mind regarding his dealings with both Restrepo and Figueroa. Kelly's duty of attorney-client confidentiality, combined with his duty to counsel his clients against committing further crimes, forms the basis for his primary defense; that he acted not with criminal intent but within the legitimate bounds of legal representation. f.n.#20. The proffered testimony was thus crucial to Kelly's defense, and its exclusion substantially hindered him from articulating this defense. f.n.#21. ... For the foregoing reasons, the district court's exclusion of Kelly's proffered testimony constituted reversible error."

Kelly, 888 F.2d at 743-744.

Cavin and Kelly illustrate the ineffective assistance Mr. Gormley's trial counsel provided and it prejudiced Mr. Gormley as much as the Court's trial rulings prejudiced Cavin and Kelly.

Based upon the foregoing law and ethical considerations, it is also clear that several portions of the Government's closing argument were improper, because they sought to attribute criminal conduct to typical, protected lawyer conduct; Trial Counsel was ineffective for failing to object to those portions of the Government's closing argument, which severely prejudiced Mr. Gormley vis-a-vis the Jury. Trial transcripts, Vol. XI, pages 49-100; pages 185-200.

For example, AUSA John Frail stated, "Then, ladies and gentlemen, the investigation becomes aware to everyone when a search warrant is executed at the home of Roger Damron,

And who does Damron call? Lawyer Gormley. And for what purpose? "What do I do?" Gormley says, "Go ahead, Let them look."

Trial trans, Vol XI, p 68,

Obviously Mr. Gormley was providing legal advice to which Mr. Damron was entitled under the Sixth Amendment to the Constitution, but trial counsel never requested a Jury charge on the Sixth Amendment, or objected to the Government's closing argument

U.S. Attorney Rebecca Betts stated in closing,

"... we have lawyer James Gormley. His situation is a little different in this case. Here he tries to take that mask or cloak of lawyer and he tries to wrap it around himself so tight that nothing criminal touches him. He's just an attorney doing attorney type work, helping set up an escrow account, foreign grantor trusts, offshore accounts and the like, for an hourly fee, he says, like the $20,000 fee that he got out of that Bayshore account in 1997 from Stephen Oles.

Mr. Parker in his opening argument called this practicing law. Well, we the attorneys for the people of the United States, call it a crime. Which is it?"

U.S. v. Sanders, 929 F.2d 1466 (4th Cir. 1991).

Trial trans. Vol. XI, p. 75.

Again, Mr. Gormley's trial counsel failed to have either requested proper jury instruction [for example, 48 U.S.C. section 1515(c) and the Fourth Circuit's holdings in Schatz v. Rosenberg and U.S. v. Lieberman, supra] or to have objected to the Government's closing argument. No witness ever testified that of any of the approximately $30,000 of total attorneys fees that he

Gormley received between 1995 and 1997 was anything other than a bona fide fee. The Government simply asked the Jury to speculate that the fees were for more than lawyering. But a Federal ~~District~~ Court has held that such is not permissible.

"Also, M.M & M [a law firm] derived no additional benefit from the transaction, above and beyond its fee as counsel. A fee alone cannot be considered a positive factor [of fraud], or every legal representative to a transactional client could find itself owing a duty to the third party involved."

In re: Infocure Securities Litigation, 210 F.Supp.2d 1331, 1352 (N.D. Ga. 2002)

Assistant U.S. Attorney Philip Wright reiterated the point in his rebuttal closing, but, again, trial counsel failed to object.

"All this discussion about, 'Well, he was just doing his job as a lawyer, working legal fees,' well, that's his motive, ladies and gentlemen. He is a lawyer. He's proud to be a law

Trial trans, Vol. XI, p. 189.
This was a blatantly improper statement
for closing argument, but, again, trial
counsel failed to object
The are additional examples too. Miss Betts
argued as follows:
"Now, does it make sense that Gormley
would represent all sides of this
transaction and advise against this
investment? Well, it only makes sense
if he got out of this transaction
once he advised against it and if
he ceased to represent these particular
clients. But he didn't, did he?"

Trial trans Vol. XI, p. 78.
First, the evidence did not show that Mr.
Gormley had represented "all sides" of the
transaction, so that was a blatant mis-
characterization to which counsel should
have objected. Second, as the foregoing
ethics rules make clear, Mr. Gormley was
not obligated to withdraw from representing
Mr. Damron, just because he disobeyed his
legal advice and attempted to invest in a deal
Mr. Gormley refused to "green light."
The evidence is clear that from 1996 onward,
the only person Mr. Gormley represented,

as legal counsel, was Roger Damron. He may have spoken to some of the other defendants during 1996-97, but it was only in his capacity as Mr. Damron's lawyer, trying to help recover the money Mr. Damron had lost to Mr. Oles and Mr. Raimer, after disobeying Mr. Gormley's legal advice. In January 1996, Mr. Gormley even recommended that Mr. Damron hire a former U.S. Attorney for the District of Nevada, Richard Pocker, Esq. to sue Mr. Oles in Las Vegas, where he then lived, but Mr. Damron lacked sufficient funds to pay a retainer. If Mr. Gormley was supposed to have been conspiring with both Mr. Damron and Mr. Oles, as alleged in the indictment, then it makes no sense that he would recommend that Mr. Damron hire a former Federal prosecutor to sue Mr. Oles. Again, trial counsel was ineffective for failing to object to Miss Betts' closing, which mischaracterized both the law and the evidence. As Schotz makes clear, where a lawyer acts as a scrivener, the lawyer can not be liable under the law without an allegation of conscious intent to violate the law, 943 F.2d at 497, citing,

See, Lamia Holding Co v. Shearman & Sterling Law Firm and Bankers Trust Co, 758 F.Supp, 159 (S.D.N.Y. 1991), Woodward V. Metro Bank of Dallas, 522 F.2d 84, 96 (5th Cir, 1975) and Stokes v. Lokken, 644 F.2d 779, 784 (8th Cir, 1981)

Later, Miss Betts state the following in closing argument:

"Well, if you haven't figured it out, the (church) parishes at Ernst Tietjen are the equivalent of Jim Gormley's foreign grantor trusts. They're both tax dodges."

Trial trans, Vol XI, p. 99
Again, Miss Betts' mischaracterized the law, but Mr. Gormley's trial counsel failed to object. Foreign grantor trusts provide a completely legal way for U.S. benefic-iaries to receive money tax free. See, Revenue Ruling 69-70. That law did not change until August 1996 (a year after the trusts created in this case had been established. See, the "grantor trust rules" 26 U.S. Code sections 670-679. They were not an illegal "tax dodge" as Miss Betts suggested to the Jury. Mr. Gormley was again prejudiced by counsel's failure to object.

Mr. Gormley has already provide two cases indicating that his trial counsel was ineffective for failing to call another lawyer as an expert witness concerning the law of lawyering and legal ethics, to support his theory of defense for Mr. Gormley, U.S. v. Cavin, 39 F.3d 1299, 1308 (5th Cir 1994) and U.S. v. Kelly, 888 F.2d 732, 743-44 (11th Cir, 1989). Trial counsel failed to investigate the possibility of finding an expert attorney witness, although it is hard to imagine how a "just practicing law" theory of defense could properly be presented without expert testimony and a proper theory of defense, jury instruction.

Because there have been many cases where attorneys have been involved with clients exploring foreign bank debenture trading programs, where the attorneys were not prosecuted, trial counsel should also have located, interviewed and called some of them as expert witnesses at Mr. Gormley trial, as Mr. Gormley specifically requested that Mr. Parker do, but he refused. Perhaps the most relevant of such witnesses is Atlanta attorney William W. Gardner, who is the person who told Mr. Gormley that such foreign bank debenture trading programs

do exist, and that he had previously represented clients in attempting to participate in such programs, Mr. Gardner's testimony would have countered the Government's arguments that Mr. Gormley had been "willfully blind" about such programs by demonstrating the source of Mr. Gormley's beliefs. Conveniently, what Mr. Gardner told Mr. Gormley about foreign bank debenture trading programs is set forth in the transcript of an October 1995 American Arbitration Association arbitration in Atlanta, Georgia, where Mr. Gardner served as Mr. Gormley's expert witness on this precise subject. The 1995 Arbitration transcript can be found in the record of this case at Docket number 790. Mr. Gardner's grand jury transcript in this case can be found at Docket number 798. Mr. Gormley's trial counsel was ineffective for not interviewing or calling William W. Gardner as a witness in Mr. Gormley's defense. This ineffectiveness severely prejudiced Mr. Gormley with the jury, who was left with the impression that Mr. Gormley must have been, at the least, willfully blind to the existence of so called foreign bank debenture trading programs. Only Mr. Gardner could have

credibly disclosed to the jury that he had told Mr. Gormley that foreign bank debentures trading programs do exist and that Mr. Gardner had previously represented clients in attempting to participate in such programs. Mr. Gormley materially relied upon what Mr. Gardner had told him, which helps the jury understand the reason for Mr. Gormley's legal advice and conduct in this

Mr. Gormley also requested that trial counsel contact Washington, D.C. attorney Lewis Rivlin about serving as an attorney witness concerning foreign bank debenture trading programs, but Mr. Parker refused to even try to telephone Mr. Rivlin. Lewis Rivlin's involvement with such a program is disclosed in the June 14, 1999 Forbes magazine on page 280.

Other attorneys involved in such programs could easily have been located by trial counsel on Lexis or WestLaw, using simple word searches, but trial counsel never investigated. See, S.E.C. v. Pinckney, 923 F.Supp. 76, 81 (EDNC 1996) [attorneys Shipman and Rhine advised the prospective investor, Lanny Wilson, not to invest $10 million in a prime bank instrument program, and the attneys were not sued or prosecuted.]

S.E.C. v. Bremont, 954 F. Supp. 726 (S.D.N.Y. 1977) [Defendant and his attorney sued civilly by the S.E.C. but not prosecuted for activities involved in promoting a "prime bank instrument" scheme]; Local 875 I.B.T. Pension Fund v. Pollock, 992 F. Supp. 545, 564 (E.D.N.Y. 1998) [Attorney sued civilly in case where a union pension fund lost —$9.3 million in a "prime bank instrument" scheme, but only for alleged legal malpractice — no criminal prosecution]; Grabauski v. Bank of Boston, 997 F. Supp. 111 (D.Mass. 1997) [Major Boston bank sued civilly in prime bank instrument scheme involving $21 million deposited by investors into escrow account which money was lost when the bank wire-transferred the funds to a con man who was using a power of attorney]; S.E.C. v. Infinity Group Co., 212 F. 3d 180 (3d Cir. 2000), affirming, 993 F. Supp. 324 (E.D. Pa. 1998).

Another set of cases is The Trust Group Limited v. Kentucky Assx. of Counties and S.E.C. v. The Trust Group Limited (case numbers unavailable to Mr. Gormley in prison), from U.S. District Court for the Eastern District of Kentucky at

Frankfort, Kentucky. In that case, a $35 million prime bank instrument trading program was approved by the due diligence department of Shearson Lehman Bros, a Wall Street investment bank. The president of The Trust Group Limited was a Colorado attorney. No one was criminally prosecuted. Mr. Gormley's trial counsel was ineffective for failing to investigate and/or call an expert attorney witness on prime bank instrument programs to counter the Government's expert witness Herbert A. Biern, which is located at Trial Trans. Vol VII, pp. 21-67, in terms of the fact that an attorney would have to be ignorant or willfully blind to believe in the existence of such programs, U.S. v. Gray, 878 F.2d 702, 710-11 (3d Cir, 1989)

A related area of ineffectiveness by Trial Counsel Buddy Parker was in preventing Mr. Gormley from testifying in his own behalf in connection with the theory of defense that he had only been practicing law without any criminal intent, and did not agree to commit crimes with the co-defendants or Roger Damron. The U.S. Supreme Court has held that a criminal defendant has a Constitutional right to testify in his own defense.

Jones v. Barnes, 463 U.S. 745, 751 (1983).

Rock v. Arkansas, 483 U.S. 44 (1987). "A defendant's right to testify is personal and can only be waived by the defendant himself," the defendant's right to testify is not a matter of "trial strategy" to be decided by counsel. U.S.v. McMeans, 927 F.2d 162, 163 (4th Cir. 1991). The trial court does not have a duty sua sponte to conduct a colloquy with the defendant at trial to determine whether the defendant has knowingly and intelligently waived the right to testify. McMeans, 927 F.2d at 163. Because the burden of ensuring that a criminal defendant is informed of the nature and existence of the right to testify rests upon trial counsel, the burden shouldered by trial counsel is a component of effective assistance of counsel. Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997). Thus, a defendant's claim that his trial counsel impermissibly interfered with his right to testify must satisfy the two-prong test established in Strickland v. Washington, 466 U.S. 668 (1984). See Brown, 124 F.3d at 79.

In Mr. Gormley's case, trial counsel threatened and intimidated him into not

testify at trial, despite Mr. Gormley's request that counsel prepare him to testify. Early in Mr. Parker's representation, he told Mr. Gormley that for his defense strategy, he intended to cross examine the Government's witnesses and call only Dr. Ralph Touma as a defense witness. Mr. Parker said that it would not be necessary for Mr. Gormley to testify in his own behalf. After sitting through the prosecution's case in chief, Mr. Gormley decided that he had to testify, since there were certain issues only he could clarify for the jury. While walking on the pedestrian Mall in Huntington, on the way back to the Holiday Inn after Court had ended for the day on Thursday, November 11, 1999, Mr. Gormley told Mr. Parker that he wanted him to prepare Mr. Gormley to testify in Court the following day (Friday) or on Monday when his defense case began. Mr. Bryant, who was walking with Mr. Parker and Mr. Gormley, is a witness to what transpired. Mr. Parker stopped walking and yelled and screamed at Mr. Gormley. He said, "I've told you from the beginning that you are not going to testify, I won't prepare you to testify. If you try to

take the witness stand and testify, I'll walk out of that Court room!" [OR words to that effect]. MR. Parker prohibited MR. Gormley from testifying and refused to prepare him to testify, despite MR. Gormley request. The following day, in Court, MR. Parker covered himself and put MR. Gormley on the spot by asking the Court to confirm that MR. Gormley was waiving his right to testify, which Judge Chambers did on the record, Trial trans. Vol. VIII, pp. 12–13. MR. Gormley was too intimidated by MR. Parker's threat and his refusal to prepare him to testify to assert himself before the Court. If MR. Parker had "walked out of the Court-room" as he had threatened, MR. Gormley had no funds with which to have hired new lead counsel in the middle of trial. MR. Gormley submits that MR. Parker's tactics with his client constitute ineffective assistance of counsel, which severely prejudiced! MR. Gormley and rendered his trial fundamentally unfair, U.S. v. McCambridge, 551 F.2d 865 (1st Cir. 1977).

ISSUE #2: Trial Counsel was ineffective because he failed to request a Jury Instruction on "Multiple Conspiracies", and Appellate Counsel was **ineffective for failing to raise this issue on appeal**, since it was a "dead£bang winner" issue. See, Wims v. U.S., 1993 WL 333209 (N.D.Ind.1992), affirmed, 983 F.2d 1074 (Table), 1992 WL 333209 (7th Cir. 1992) (Circuit Court affirms District Court's Order granting Wims' 2255 Habeas Corpus Motion based upon ineffective assistance by both trial counsel and appellate counsel, concerning failure to argue the trial court's failure to give a "multiple conspiracy" jury instruction). The law in the Fourth Circuit is that the issue of whether the defendants may have participated in the single conspiracies charged in the indictment, or, whether there were multiple conspiracies (other than as charged in the indictment) is to be determined by the Jury under proper instructions from the Court. U.S. v. Banks, 10 F.3d 1044, 1051 (4th Cir.1993). Two other Fourth Circuit cases illustrate the Jury charge that Mr. Gormley's Trial counsel failed to request, and which his appellate counsel failed to argue on appeal. In U.S. v. Camps, the Circuit Court said:

> "(I)n order to sustain its burden of proof for (the conspiracy charge), the Government must show that the single conspiracy alleged in Count 1 of the Indictment existed. And proof of separate or independant conspiracies is not sufficient. Even if the evidence in the case shows the the defendant, Camps, was a member of some conspiracy, but if that conspiracy is not the single conspiracy charged in the Indictment, you must acquit the defendant .

32 F.3d 102, 104 (4th Cir.1994).

In an earlier case, the Circuit Court made a similar statement of law

> "The jury was properly instructed that it might find a single conspiracy, separate conspiracies not charged in the Indictment, or no conspiracy at all, and that they must convict Urbanik only upon their finding that he was a member of the single conspiracy charged in the Indictment. That verdict was adequately supported by the evidence."

801 F.2d 692 (4th Cir. 1986), at p. 696.

As in the Wims case, supra., the Trial court's failure to give the
"multiple conspiracies" Jury instruction that Mr. Gormley's counsel
failed to request, caused Mr. Gormley substantial prejudice with the
Jury, since, in this case, it could easily be seen that as to Count
1, there were three separate conspiracies (or more), differently
peopled, with overlapping players among them.  For example, the
evidence was that Messrs. Bollin and Damron undertook the so-called
second, $250,000 deal with co-defendant Stanie Benz without ever
mentioning it to Mr. Gormley.  Mr. Damron testified that he did not
ask for Mr. Gormley's input as to deals 2 and 3 (the "add-on"),
because Mr. Gormley had refused to "green light" deal number 1, so
he knew Mr. Gormley would not "green light" any other such deals
either.  The Government virtually admitted, upon Mr. Gormley's
Motion for a Directed Verdict of Acquittal, folowing the close of the
Government's evidence, that they had no evidence of Mr. Gormley's
participation in a "securities fraud conspiracy", so the absence of
the "multiple conspiracies" Jury instruction was most detrimental
to Mr. Gormley on that issue, particularly in conjunction with
Trial Counsel's failure to locate applicable Fouth Circuit law to
the effect that it is almost impossible to hold counsel liable for
participating in a client's securities fraud.  Schatz v. Rosenberg,
943 F.2d 485 (4th Cir. 1991) (holding that attorneys have no duty to
disclosue fraudulent misrepresentations made by their clients in the
sale of securities, (2) attorneys do not make primary violations of
Section 10(b) of the Securities Act of 1933; (3) attorneys do not
aid and abet their clients in violation of the securities laws; and
(4) attorneys did not knowingly perpetuate or assist their clients'
misrepresentations in violation of Maryland state law).  Although
Schatz is a civil case, the law would be the same in the criminal

context, since the same statutes are being applied, just with a higher burden of proof and different consequences.  Mr. Gormley was also prejudiced by trial counsel's failure to request Jury charges based upon the <u>Schatz</u> case, and the failure of appellate counsel to raise the absence of such jury charges on appeal, even though they would have been subject to review only for harmless error.  Trial counsel also prejudiced Mr. Gormley by failing to locate and cite to the trial court upon the making of Motions for a Directed Verdict of Acquittal, both at the close of the Government's evidence and following the Jury's guilty verdict, the <u>Schatz</u> case and the Fourth Circuit's opinion in <u>U.S. v. Lieberman</u>, 106 F.3d 393 (Table), 1997 WL 26554 (4th Cir. 1997) (Conviction of attorney/C.P.A. for conspiracy to commit money laundering reversed; "We know of no, and the Government has suggested no, requirement that a lawyer or public accountant must know from where a client's money comes." <u>accord</u>, <u>U.S. v. McDougald</u>, 990 F.2d 259 (6th Cir.1993); <u>U.S. v. Baker</u>, 985 F.2d 1248, 1253-54 (4th Cir. 1996) (Money laundering conviction reversed as "raw speculation"); <u>U.S. v. Corchado-Peralta</u>, 318 F.3d 255 (1st Cir.2003) (Convictions for conspiracy to commit money laundering reversed); <u>U.S. v. Frigerio-Migiano</u>, 254 F.3d 30 (1st Cir.2001) (Convictions for conspiracy to commit money laundering reversed)).  If the <u>Schatz</u> and <u>Lieberman</u> decisions had been located and properly cited to the Court, they might well have resulted in directed verdicts of acquittal or at least critically important jury instructions, upon which the jury might easily have found Mr. Gormley "not guilty", particularly in conjunction with the missed "multiple conspiracies" jury instruction. The same can also be said about <u>U.S. v. Holtzclaw</u>, 950 F. Supp. 1308, 1313 (S.D.W.Va.1998), where Judge Goodwin granted a directed verdict of acquittal on securities fraud charges, following a guilty verdict,

in a case involving a multi-level marketing gold coin program
virtually identical to Mr. Damron's Gold Eagle Club. Judge Goodwin
found and held that the Holtzclaw program was not a ponzi scheme,
because it does not involve the sale of securities (investment contrac
Notably, Assistant U.S. Attorney Philip Wright, one of Mr. Gormley's
prosecutors, was also a prosecutor in Holtzclaw, and he appears to
have breached his duty of candor to the Court by referring during Mr.
Gormley's trial to Mr. Damron's Gold Eagle Club business as a "~~~~~~
scheme" (Trial Trans., Vol. $\cancel{II}$ , pp. $\cancel{13}$-$\cancel{14}$, even though he knew
it was not so, in light of Judge Goodwin's directed verdict of acquitt
in Holtzclaw, only 9 months earlier. W.Va. Rule of Professional Resp.
3.3, U.S. v. Shaffer Equipment Co. supra. Mr. Gormley's trial counsel
never located the Holtzclaw case, however, so he also never asked for
a jury instruction based upon it for Mr. Gormley. If the Jury had
been properly instructed, they might have found that Mr. Gormley was
"not guilty" because, as far as he knew, the ~~~~ money Mr. Damron
"invested" in the Foreign Bank Debenture Trading Programs was his
commissions from his Gold Eagle Coin business (as he had told Messrs.
Gormley and Bollin), and he disobeyed Mr. Gormley's legal advice not
to try to invest in Program #39 (or any other such Program); thus,
Mr. Gormley could not have been a conspirator. Mr. Wright's statement
may have led the jury to find that the money Mr. Damron tried to inves
was proceeds of a "specified unlawful activity" (wire fraud) even if
Mr. Gormley only knew ~~~~ to be commissions from the Gold Eagle coin
business. Mr. Gormley's trial counsel also prejudiced him by not
locating 18 U.S.C. section 1515(c), the "safe harbor" for attorneys
from liability for obstruction of justice. U.S. v. Kellington, 217
F.3d 1084, 1098-1101 (9th Cir.1999), U.S. v. Kloess, 251 F.3d 941,
948-49 (11th Cir. 2001). With a jury instruction based upon 1515(c)

and "multiple conspiracies", it is likely that the Jury would have acquitted Mr. Gormley of the Count 1 conspiracy.

In considering Mr. Gormley's argument concerning the "multiple conspiracies" jury instruction, the Court may want to consider that Mr. Tietjen's counsel, Jackie Hallinan, did ask the Court to give a "multiple conspiracies" jury instruction, but the Court defferred ruling on the request, and from a reading of the rest of the transcrip and the final jury instructions, neter came back to decide the issue, nor did Mrs. Hallinan mention it again. Trial trans., Vol. IX, pp. 144-146. The Court said, "All right. I know there's some case law on it. Frankly, I'm not sure I understand at this point, but I'll defer ruling until I have a chance to look at it. I'll defer ruling on single conspiracy and multiple conspiracy (ies) on pages 16, 17, and 18." Trial trans., Vol IX, page 146. This may have been a critical oversight to which all defense counsel failed to object. Based upon the Wims case, it constitutes ineffective assistance of counsel by Mr. Gormley's trial counsel and appellate counsel, which caused him substantial prejudice, justifying vacatur and a new trial. Dennis v. U.S., 917 F.2d 1031 (7th Cir. 1990).

> "(T)he failure of the District Court, over Dennis' objection to give a multiple conspiracy instruction was error. 'The defendant in a criminal case is entitled to have the jury consider any theory of the defense which is supported by law and which has some foundation in the evidence.' U.S. v. Douglas, 818 F.2d 1317, 1320 (7th Cir.1987)(quoting, U.S. v. Boucher, 796 F.2d 972, 975 (7th Cir.1986)). There was substantial evidence to show multiple conspiracies rather than a single conspiracy, and the district court's refusal to give an instruction on Dennis' multiple conspiracies theory denied Dennis a fair trial. Id.

U.S. v. Dennis, 917 F.3d at 1033.

Another reason trial counsel should have requested this instruction in Mr. Gormley's case is because he was actually charged with 2 conspiracies in the same indictment. Theory of defense applied to

Count 2 of the indictment too, for conspiracy to commit money laundering. With an appropriate multiple conspiracies jury instruction, the jury could easily have found several separate money laundering conspiracies, such as one involving Bollin and Damron, another involving Raimer and Oles, and a third involving Mrs. Holcomb and Mr. Oles. Mr. Gormley and/or Mrs. Benz may or may not also have been found to have been involved in one of those separate conspiracies, but Mr. Gormley (and the other defendants) were entitled to have their trial counsel request a "multiple conspiracies" jury instruction given, since the determination of this issue is for the jury. The fact that the found Fourth Circuit found sufficient evidence to uphold the convictions as individual conspiracies does not eliminate the prejudice caused to Mr. Gormley by his counsel's failure to request a multiple conspiracies jury instruction. On this issue alone, the Court must grant the Motion for Habeas Corpus and vacate Mr. Gormley's convictions, which are all inter-related, in terms of Mr. Gormley's intent/state of mind.

106 F.3d 393 (Table)
**Unpublished Disposition**

(Cite as: 106 F.3d 393, 1997 WL 26554 (4th Cir.(Md.)))

NOTICE: THIS IS AN UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA4 Rule 36 for
rules regarding the publication and citation of
unpublished opinions.)

United States Court of Appeals, Fourth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Michael A. LIEBERMAN, Defendant-Appellant.

No. 96-4118.

Argued Dec. 6, 1996.
Decided Jan. 24, 1997.

Appeal from the United States District Court for the
District of Maryland, at Baltimore. Walter E.
Black, Jr., Senior District Judge. (CR-93-391-B)

ARGUED: Stephen Howard Sacks, Baltimore,
Maryland, for Appellant. Harvey Ellis Eisenberg,
Assistant United States Attorney, Baltimore,
Maryland, for Appellee. ON BRIEF: Lynne A.
Battaglia, United States Attorney, Baltimore,
Maryland, for Appellee.

Before WIDENER, MURNAGHAN, and
NIEMEYER, Circuit Judges.

- OPINION

PER CURIAM:

**\*\*1** The defendant, Michael A. Lieberman, an
attorney and certified public accountant, was
indicted for conspiracy to commit money laundering
in violation of 18 U.S.C. § 1956 (1994 &
Supp.1996). He practiced alone frequently and
over a substantial period of time represented
Christopher Ecker. The representation concerned
legal, perfectly public matters, especially
preparation of income tax returns. Ecker, so far as
the record shows, made no revelation to Lieberman
of the sources from which Ecker derived assets for
the financial transactions in which Ecker engaged or
from which to meet his tax obligations.

The matter is of controlling importance since Ecker
was a frequent and successful marijuana smuggler,
particularly from Thailand, and from such activities
derived substantial sums of money. The United
States indicted Lieberman for money laundering, on
the belief that many of the sums received by
Lieberman from Ecker to carry on business
ventures for Ecker to meet the income tax liabilities
shown on returns prepared by Lieberman (and
which dealt only with legal activities by Ecker), as
well as Lieberman's attorney's fees, were products
of the illegal drug activity. However, the fact of
such a source was not enough alone to prove the
money laundering. In addition, proof of knowledge
of an illegal source was requisite. United States v.
Heaps, 39 F.3d 479 (4th Cir.1994); United States v.
McDougald, 990 F.2d 259 (6th Cir.1993); United
States v. Campbell, 977 F.2d 854 (4th Cir.1992) (a
conviction of money laundering was possible
because there was evidence of actual subjective
knowledge), cert. denied, 507 U.S. 938 (1993).
The government acknowledges that actual subjective
knowledge is essential to proof of guilt. Direct, and
even indirect, proof was not forthcoming.
Knowledge of other drug dealers or of other
acquaintances to whom Ecker revealed his drug
activities was shown, [FN1] but there was absolutely
no proof that Lieberman was told of or was present
at or otherwise learned of the illegality of Ecker's
activities or the resulting illegal proceeds. [FN2]

> FN1. Generally, Ecker claimed to be engaged in
> legitimate business.

> FN2. On one occasion, Ecker claimed that
> Lieberman was aware of all his business dealings,
> but the reference was to the legal business
> dealings.

The prosecution relied on and the district judge
allowed the doctrine of willful blindness to permit
the jury to find an inference of knowledge. The
fact that Ecker came from a respectable family and
that his father had been the mayor of Rockville,
Maryland was one proof asserted [FN3] together
with Ecker's lack of probable sources of legal funds,
which, it was asserted, demonstrated that the money
received from Ecker by Lieberman to meet
altogether legal obligations, such as legal fees and
contractual debts were of suspicious origin. But a
Mayor of Rockville could have been wealthy and
Ecker's lack of sources of legal funds at the time of

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

trial does not establish what his situation was at the earlier times when he dealt with Lieberman. The lottery and the race tracks are regularly involved in favoring the lucky, sometimes with substantial sums of money. We know of no and the government has suggested no requirement that a lawyer or public accountant must know from where a client's money comes. Several lawyers who handled transactions involved in the case testified that they never asked about the source of money provided by Ecker. Hence concluding knowledge from merely not asking is outright speculation.

> FN3. There was no evidence of either knowledge by Lieberman of a lavish life style by Ecker, or indeed, of actual such lavish life style.

**2 In short, there has been no proof, let alone proof beyond a reasonable doubt, of anything about which Lieberman was willfully blind. Therefore, while the instruction on willful blindness may have been correct, the evidence to support it was wholly lacking.

Consequently, the judgment of conviction is reversed and the case is remanded for entry of a judgment of acquittal.

REVERSED AND REMANDED. [FN4]

> FN4. Ecker was also charged, but pleaded the Fifth Amendment so was not available as a witness for either the government or Lieberman. Undoubtedly, Ecker was almost certainly the most knowledgeable source of information as to Lieberman's knowledge of drug source or the absence thereof. Ecker's plea of guilty, which would have negated the availability of the Fifth Amendment, was close to being finally negotiated when Lieberman was tried, but the government did not seek a deferral of Lieberman's trial to secure Ecker's testimony. The fact suggests that Ecker's testimony would not have been helpful to the prosecution on the issue of Lieberman's knowledge of Ecker's illegal activities.

NIEMEYER, Circuit Judge, dissenting:

The question we have is whether the government presented sufficient circumstantial evidence to have allowed any reasonable jury to find beyond a reasonable doubt that Michael Lieberman conspired to launder illegal money of his client, Christopher Ecker. Because I believe the evidence was sufficient, I would affirm the jury's verdict.

While the government was unable to present direct evidence that Lieberman knew Ecker's illegal drug activity was the source of his money, the circumstantial evidence and common sense support the conclusion that he knew enough to attempt to place himself in a position of deniability.

For six years Lieberman, who was both an accountant and a lawyer, acted as Ecker's financial consultant, accountant, and lawyer. In that capacity, according to the evidence, he "was aware of all of [Ecker's] business dealings and was hired to help him ... invest his money." Evidence was presented that Lieberman was not only involved in all of Ecker's investments, but also acted aggressively in negotiating deals on Ecker's behalf.

It is uncontroverted that during the period in which Lieberman advised Ecker, Ecker was a marijuana dealer who had made millions of dollars in that illegal business; he made $4 million in one transaction alone. While Ecker had income from legitimate business for which Lieberman prepared and filed tax returns, the amount of that income claimed during those years was modest, ranging from $34,000 to $74,000. But during the same period, Lieberman was handling transactions on behalf of Ecker in the six-figure range, far beyond the amounts disclosed on Ecker's tax returns. No legitimate source for Ecker's additional income was ever offered.

While the government was unable to impute direct knowledge to Lieberman of Ecker's drug dealings, it did show that Lieberman knew that Ecker acquired money with "a lot of risk." The government presented testimony, moreover, that Ecker was cavalier about disclosing his marijuana deals. There was testimony that he advised both Marc Klein and his landlord of the $4 million marijuana deal. At one point, when Ecker turned over a duffle bag full of cash (about $200,000 worth) to invest in Klein's business, Ecker said only he, Lieberman, Klein and one other person knew about the deal.

From this evidence, and other details presented by the government, the jury could well have concluded beyond a reasonable doubt that Lieberman either knew of Ecker's illegal dealings or deliberately turned a blind eye to them in order to be able to deny knowledge. Accordingly I would affirm Lieberman's conviction as a conspirator in Ecker's

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Only the Westlaw citation is currently available.

United States District Court, N.D. Indiana, Fort
Wayne Division.

**UNITED STATES of America**
v.
**Keith James WIMS.**
**Keith James WIMS**
v.
**UNITED STATES of America.**

Nos. FCR 89-18, F91-180.

Jan. 17, 1992.

MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

**\*1** On August 3, 1989, Kerry N. Thompson,
Wesley Dennis and Keith James Wims, were
indicted in a one-count indictment in this case,
which indictment reads as follows:
  From on or about July 18, 1989, up to and
  including July 21, 1989, in the Northern District
  of Indiana,
  KERRY N. THOMPSON, WESLEY DENNIS
  and KEITH JAMES WIMS, defendants herein, did
  unlawfully, knowingly, and wilfully conspire,
  combine, confederate, and agree, together with
  and other persons unknown to the Grand Jury, to
  commit offenses against the United States and to
  violate Title 21, United States Code, Section
  841(a), that is, to distribute cocaine, being less
  than 500 grams, a Schedule II Narcotic Drug
  Controlled Substance;
  All in violation of Title 21, United States Code,
  Section 846.

A superseding indictment was filed on October 5,
1991. Each defendant entered a plea of not guilty
to both the indictment and to the superseding
indictment. The undersigned Judge became
responsible for this case by Order entered on August
8, 1989, and conducted the trial of this case in Fort
Wayne, Indiana on November 8 and 9, 1989, in
which all three defendants were convicted as
charged. Defendant Thompson was sentenced to a
term of 41 months followed by five years of
supervised release and a $50.00 special assessment.
Defendant Dennis was sentenced to a term of 21

months to be followed by three years of supervised
release and a $50.00 special assessment. Defendant/
petitioner Wims was sentenced to 262 months
followed by six years of supervised release and a
$50.00 special assessment. All three defendants,
including petitioner Wims prosecuted appeals.

The appeal of defendant/petitioner Wims was the
first one to reach the Court of Appeals, and a panel
consisting of Circuit Judges Cummings, Coffey and
Easterbrook affirmed the aforesaid conviction as to
Wims by an unpublished Order entered on June 19,
1990. The same is attached here as Appendix "A".
and incorporated herein. More on that one later.
As to Wims, this order is certainly the law of this
case.

Defendant Thompson prosecuted an appeal, which
was also affirmed by an unpublished Order entered
October 17, 1990, by a panel of the Court of
Appeals consisting of Circuit Judges Cudahy and
Posner and Senior Circuit Judge Pell. The same is
attached hereto as Appendix "B" and incorporated
herein.

The third appeal by defendant Dennis resulted in a
published opinion in *United States v. Dennis*, 917
F.2d 1031 (7th Cir.1990). *Dennis* was adhered to in
*U.S. v. Townsend*, 924 F.2d 1385, 1393.

On August 5, 1991, Keith James Wims, appearing
*pro se*, filed his petition seeking relief under 28
U.S.C. § 2255. On August 23, 1991, this court
appointed Susan Y. Miller as his counsel in the
prosecution of the same. The United States of
America filed a response to the Wims petition on
September 20, 1991, and counsel for defendant/
petitioner Wims filed a reply on December 26,
1991. This court now takes full judicial notice of
the entire record in this case.

**\*2** Certainly, this court must, among other things,
take a close side-by- side comparison of the three
opinions of the Court of Appeals. In that regard, it
may be of some minor consequence as reflected in
pages 221 to 244 of the trial record that long-term
Assistant United States Attorney David H. Miller
cited to this court in the course of the conference on
instructions a case authored by Judge Coffey and
cited as *United States v. Mazzanti*, 888 F.2d 1165
(7th Cir.1989), *cert. denied*, 495 U.S. 930, 110
S.Ct. 2167 (1990), *later proceeding*, 925 F.2d 1026

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Page 5

(7th Cir.1991). As indicated, the particular conference on instructions occurred on November 9, 1989. Assistant United States Attorney Miller provided this court with a slip opinion of *Mazzanti*, which persuaded this court to restrain its hand in giving a multiple conspiracy instruction which had been provided in the original set of the court's instructions presented. With no criticism of anyone intended, the simple fact is that Judge Coffey's *Mazzanti* case has not been addressed by the Court of Appeals in any of three orders or opinions emanating from the trial of this case.

This court specifically relied on the following statement in *Mazzanti:*

### MULTIPLE CONSPIRACY INSTRUCTION

Mazzanti and Born both contend that the district court committed reversible error in refusing to give a proposed jury instruction offering the jury the option of finding a number of smaller conspiracies as an alternative to finding a single conspiracy. Mazzanti and born argue that the evidence presented at trial "showed the possibility of two conspiracies." They contend that one conspiracy "may have consisted of DeLisle, Born, and Mazzanti: and a second conspiracy consisted of Taglia and two other persons charged in the indictment. Mazzanti and Born assert that the DeLisle conspiracy may have been responsible for the drug sales of april 2, April 13 and May 13 while the Taglia conspiracy may have been responsible for drug deals on April 21, May 21 and July 13. The April 21, May 21 and July 13. The April 21 and May 21 drug buys were in the indictment, but only persons other than Mazzanti and Born were charged with these events.

In our review of the trial judge's refusal to give the multiple conspiracy instruction we recognize that a "trial court does not err in refusing to give a multiple conspiracy instruction if the evidence does not warrant such an instruction." *United States v. Towers*, 775 F.2d 184, 189 (7th Cir.1985). As this court stated in *Towers*, 775 F.2d at 189.

"A reviewing court determining whether the evidence established a single conspiracy or multiple conspiracies must consider the evidence in the light most favorable to the government. *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir.1981). To determine whether a single or multiple conspiracy existed, the court must look to

the nature of the agreement. *United States v. Kendall*, 665 F.2d 126, 136 (7th Cir.1981). 'If the persons joined together to further one common design or purpose, a single conspiracy exists.' *Id.*"

*3 "As long as a common goal is being furthered, a person 'can be part of a common enterprise without being indispensable to that enterprise; and a common enterprise for illegal ends is a conspiracy whose inessential as well as essential members are conspirators.' " *United States v. Whaley*, 830 F.2d 1469, 1475 (7th Cir.19897), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988) (quoting *United States v. Cerro*, 775 F.2d 908, 914 (7th Cir.1985)).

The evidence at trial established that on July 13, 1987, Mazzanti and Born, as well as DeLisle and Taglia, were actively involved in the sale of twelve pounds of cocaine. On that day, Blessing, the informant, and undercover DEA agents Riley and Maloney met with Taglia and were joined by Mazzanti and DeLisle. During a meeting DEA Agent Riley inquired whether the quality of the cocaine was going to be good, and Mazzanti responded that Agent Riley would be very happy. At one point Mazzanti got up to make a phone call and when he hung up the phone, DEA Agent Maloney queried when the deal would be completed. Mazzanti responded "I'm trying to get a hold of my guy Paul." Shortly after this conversation, Paul Born arrived in his maroon van and exited the same van carrying a white pail containing the cocaine. Later, Mazzanti was observed placing the white pail containing cocaine in the trunk of Blessing's car.

The July 13, 1987, transaction demonstrates that Born and Mazzanti shared the common goal of selling cocaine for profit with the other co-conspirators. The July 13, 1987, transaction was overwhelming evidence of a conspiracy with a single goal. Further, Mazzanti and Born's activities concerning the April 2, April 13 and May 13, 1987, drug deals demonstrate that the defendants were in contact with DeLisle and Taglia and were actively involved in the sale of cocaine on these dates. Also, after both the April 2 and May 13 cocaine buys, Taglia, in conversations with Blessing, commented that he was aware of these cocaine buys. Last, DeLisle was present at each of the drug transactions in which Born and Mazzanti were charged. Thus, viewing this evidence in the light most favorable to

the government, we agree with the district court that Mazzanti and Born's activities established one single ongoing conspiracy rather than multiple conspiracies.

As for the April 21 and May 21 drug deals, the only evidence introduced at trial occurred when Mazzanti's counselor attempted to cross-examine informant Blessing concerning these cocaine transactions. The counselor inquired whether Taglia and two other persons were the only ones involved in those transactions. Mazzanti's counsel was the only one who sought inquiry into the area, and Mazzanti and Born were not charged with these April 21 and May 21 offenses. Thus, we hold that the evidence did not warrant a multiple conspiracy instruction, and the trial court's rejection of the proffered instruction was proper.

*4 *Mazzanti,* 888 F.2d at 1173-74. The subsequent decision of the Court of Appeals in *Mazzanti* let the above statement stand undisturbed. *See* 925 F.2d at 1026.

The principal assertion of Wims and his counsel in the § 2255 petition is brought under the Sixth Amendment of the Constitution of the United States and, more particularly, under *Strickland v. Washington,* 466 U.S. 668 (1984). The teaching of *Strickland* has been specifically applied to appellate counsel in *Evitts v. Lucey,* 469 U.S. 387 (1985). *See also Fagan v. Washington,* 942 F.2d 1155 (7th Cir.1991); *United States ex rel. Simmons v. Grainley,* 915 F.2d 1128 (7th Cir.1990); *Page v. United States,* 884 F.2d 300 (7th Cir.1989); *United States ex rel. Thomas v. O'Leary,* 856 F.2d 1011 (7th Cir.1988); *Buelow v. Dickey,* 847 F.2d 420 (7th Cir.1988), *cert. denied,* 489 U.S. 1032 (1989); *United States v. Queen,* 847 F.2d 346 (7th Cir.1988) ; *United States v. Gerrity,* 804 F.2d 1330 (7th Cir.1986); and *United States v. Liefer,* 778 F.2d 1236 (7th Cir.1985).

In a generalized way, this court has recently collected approximately a year's supply of ineffective of counsel cases from this circuit and has attempted to synthesize them briefly in *Clark v. Duckworth,* 770 F.Supp. 1316 (N.D.Ind.1991). The question focuses here on whether the appellate counsel of Wims was constitutionally ineffective by not raising the issue in regard to the failure of this court to give a multiple conspiracies instruction.

That issue was raised unsuccessfully on appeal by counsel for Thompson and was raised successfully on appeal by counsel for Dennis. Certainly, at the time that counsel for Wims prosecuted his appeal, that counsel had no way of knowing that the decision in *Dennis,* 917 F.2d at 1031, would come out the way it did, or indeed had no way of knowing that the unpublished order in *Thompson* would come out the way it did.

This court has no desire whatsoever to attempt to divine the parameters of Circuit Rule 53 which states:

**CIRCUIT RULE 53. Plan for Publication of Opinions of the Seventh Circuit Promulgated pursuant to Resolution of the Judicial Conference of the United States:**

(a) *Policy.* It is the policy of the circuit to reduce the proliferation of published opinions.

(b) *Publication.* The court may dispose of an appeal by an order or by an opinion, which may be signed or *per curiam.* Orders shall not be published and opinions shall be published.

(1) "Published" or "publication" means:

(i) Printing the opinion as a slip opinion;

(ii) Distributing the printed slip opinion to all federal judges within the circuit, legal publishing companies, libraries and other regular subscribers, interested United States attorneys, departments and agencies, and the news media; and

(iii) Unlimited citation as precedent.

(2) Unpublished orders:

(i) Shall be typewritten and reproduced by copying machine;

*5 (ii) Shall be distributed only to the circuit judges, counsel for the parties in the case, the lower court judge or agency in the case, and the news media, and shall be available to the public on the same basis as any other pleading in the case;

(iii) Shall be available for listing periodically in the Federal Reporter showing only title, docket number, date, district or agency appealed from with citation of prior opinion (if reported), and the judgment or operative words of the order, such as "affirmed," "enforced," "reversed," "reversed and remanded," and so forth;

(iv) Except to support a claim of res judicata, collateral estoppel or law of the case, shall not be cited or used as precedent

(a) in any federal court within the circuit in any written document or in oral argument; or

(b) by any such court for any purpose.

(c) *Guidelines for Method of Disposition.*

(1) Published opinions.

A published opinion will be filed when the decision

(i) establishes a new, or changes an existing rule of law;

(ii) involves an issue of continuing public interest;

(iii) criticizes or questions existing law;

(iv) constitutes a significant and non-duplicative contribution to legal literature

(A) by a historical review of law.

(B) by describing legislative history, or

(C) by resolving or creating a conflict in the law;

(v) reverses a judgment or denies enforcement of an order when the lower court or agency has published an opinion supporting the judgment or order; or

(vi) is pursuant to an order of remand from the Supreme Court and is not rendered merely in ministerial obedience to specific directions of that Court.

2. Unpublished orders.

When the decision does not satisfy the criteria for publication, as stated above, it will be filed as an unpublished order. The order will ordinarily contain reasons for the judgment, but may not do so if the court has announced its decision and reasons from the bench. A statement of facts may be omitted from the order or may not be complete or detailed.

(d) *Determination of Whether Disposition is to be by Order or Opinion.*

(1) The determination to dispose of an appeal by unpublished order shall be made by a majority of the panel rendering the decision.

(2) The requirement of a majority represents the policy of this circuit. Notwithstanding the right of a single federal judge to make an opinion available for publication, it is expected that a single judge will ordinarily respect and abide by the opinion of the majority in determining whether to publish.

(3) Any person may request by motion that a decision by unpublished order be issued as a published opinion. The request should state the reasons why the publication would be consistent with the guidelines for method of disposition set forth in this rule.

Certainly, the unpublished *Wims* order entered June 19, 1990, by Judges Cummings, Coffey and Easterbrook is a part of the law of this case as far as Wims is concerned, and as far as the dimensions and

requirements of a conspiracy are concerned. Whether the unpublished opinion in *Thompson* by Judges Cudahy, Posner and Pell is a part of the law in this case with regard to Wims is another question. It is also another question as to whether this court can cite and rely on the unpublished opinion in *Thompson,* but certainly, this court has to be aware of it judicially because the same is a part of the official record in this case. However, there is no doubt that the November 13, 1990, published opinion in *Dennis,* 917 F.2d at 1031, is a statement of both the law in this case and a binding legal precedent. It may, in the eyes of some beholders, be in tension with the unpublished order in *Thompson.* However, that is not an issue appropriate for this court to decide at this level of the federal judiciary.

*6 Given the entirety of the record, and the basics of effective assistance of counsel under *Strickland,* 466 U.S. at 668, and under *Evitts,* 469 U.S. at 387, this court must conclude, very reluctantly, that the failure of appellate counsel for Wims to appropriately raise the issue as to multiple conspiracy constitutes ineffective assistance of counsel. It is difficult for this court to find a legitimate and principled way to wiggle out of that conclusion, given the binding precedential effect of Judge Will's published opinion in *Dennis,* 917 F.2d at 1031. This court means no disrespect to any member of any of the panels of the Court of Appeals, and no criticism of any of them is here intended.

As the presiding trial judge in this case and as the one who heard the evidence, this court is convinced that the evidence of the involvement of Wims is overwhelming. Reliance on the above quotation from *Mazzanti* was well taken. Others may see it differently, but until *Dennis* is either explained or modified, this court has no choice but to follow it and grant here to Wims the same relief afforded to Dennis.

This court is also sorely tempted to try to save this conviction by reference to the current authorities on harmless error. Constitutional errors in a criminal trial are grounds for reversal unless they are "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24 (1967). The petitioner is entitled to a fair trial not a perfect one. *Delaware v. Van Arsdall,* 475 U.S. 673, 681 (1986). *See also*

*Sulie v. Duckworth,* 864 F.2d 1348, 1356 (7th Cir.1988), *cert. denied,* 493 U.S. 828 (1989); *Ortega v. O'Leary,* 843 F.2d 258, 262 (7th Cir.1988), *cert. denied,* 488 U.S. 841 (1988). The harmless error rule "promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Van Arsdall,* 475 U.S. at 681. *See also United States ex rel. Thomas v. O'Leary,* 856 F.2d at 1017.

The initial inquiry for the court then "is whether absent the constitutionally-forbidden evidence, honest and fair-minded jurors might very well have brought in not-guilty verdicts." *Burns v. Clusen,* 798 F.2d 931, 943 (7th Cir.1986) (citing *Chapman v. California,* 386 U.S. 18, 26 (1967)). The court must determine " 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *United States ex rel. Ross v. Fike,* 534 F.2d 731, 734 (7th Cir.1976) (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86-87 (1963)). This circuit generally requires other evidence of guilt to be "overwhelming" before concluding a constitutional error was harmless. *See Sulie,* 864 F.2d at 1359; *Smith v. Fairman,* 862 F.2d 630, 639 (7th Cir.1988), *cert. denied,* 490 U.S. 1008 (1989); *United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1020 (7th Cir.1987) and *Burns,* 798 F.2d at 943. But in making this determination the court is not to engage in a reweighing of the evidence to determine the impact on the jury's verdict. *Fencl v. Abrahamson,* 841 F.2d 760, 769 (7th Cir.1988). Rather, the court must examine all the evidence to determine the impact of the objectionable evidence on the jury's verdict. *Id.*

*7 A closely divided Supreme Court has wrestled with the harmless error concept in the context of the introduction of confessions that may violate *Miranda v. Arizona,* 384 U.S. 436 (1966). *See Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246 (1991). *See also Yates v. Evatt.* 500 U.S. 391, 111 S.Ct. 1884 (1991), for the last comprehensive word on harmless error.

As appealing as a harmless error analysis might be, this court must come back to the square holding of Judge Will speaking for the Court of Appeals in *Dennis,* 917 F.2d at 1031. Thus, given the holding in *Dennis,* and notwithstanding the liberality with which the Supreme Court has applied harmless error, this court is hard-pressed to find a principled way in which to apply that concept to save this conviction.

Faithful adherence to the idea of following a binding precedent where it clearly applies causes this court to conclude, most reluctantly, that appellate counsel for Wims was ineffective in failing to raise the issue with regard to instructions, or the lack thereof, on multiple conspiracies. Given the subsequent judicial history in its totality, this court finds it impossible to legitimately distinguish the position of Wims from that of Dennis. For this reason, this court does not conceive that it has any choice but to **GRANT** the same relief to Wims that was granted to Dennis. Therefore, the petition under 28 U.S.C. § 2255 must be **GRANTED.** IT IS SO ORDERED.

1993 WL 23582, 1993 WL 23582 (N.D.Ind.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Case 3:03-cr-00340 Document 1074 Filed 04/18/03 Page 67 of 114 PageID #: 67

**(Cite as: 983 F.2d 1074, 1992 WL 383299 (7th Cir.(Ind.)))**

NOTICE: THIS IS AN UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA7 Rule 53 for
rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Seventh Circuit.

**Keith J. WIMS, Petitioner-Appellee,**
**v.**
**UNITED STATES of America, Respondent-**
**Appellant.**

No. 92-1624.

Argued Sept. 21, 1992.
Decided Dec. 22, 1992.

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division,
No. 91 C 180; Sharp, Chief Judge.

N.D.Ind.

AFFIRMED.

Before CUDAHY, FLAUM and KANNE, Circuit
Judges.

ORDER

**1 Keith J. Wims filed a request for relief under
28 U.S.C. § 2255, arguing that he received
ineffective assistance of counsel on the direct appeal
of his conviction for conspiring to distribute cocaine
in violation of 21 U.S.C. § 846. The district court
held that Wims was denied his Sixth Amendment
right to counsel because his appellate counsel failed
to argue that the trial court erroneously refused to
give a multiple conspiracy jury instruction. The
government appeals the district court's order
vacating Wims' conviction. We affirm.

I.

On July 18, 1989, undercover police officer Gordon
Myers met with Kerry Thompson to purchase
cocaine. When Detective Myers refused to front

Thompson the money for the purchase, Thompson
agreed to talk to his "man" and return. After
intervening meetings with Wesley Dennis,
Thompson sold Detective Myers an ounce of cocaine
for $1,200, which Myers paid in marked bills.
Dennis was subsequently arrested.

Three days later, Detective Myers met Thompson
to purchase additional cocaine. Thompson advised
that his "man" had the cocaine, but that he needed
the purchase money from Detective Myers.
Detective Myers refused to give Thompson the
purchase money, but agreed to accompany him to
the location of his "man" in McMillan Park.
Detective Myers followed Thompson to a restaurant
near the park, where Thompson entered Myers' car
and discussed the cocaine sale. Thompson told
Detective Myers that his "man" was nearby and that
if Myers gave him half of the money he would
return with the cocaine. Myers agreed to give him
the money if Thompson would meet with his "man."
Thompson took $1,200 in marked bills and began
walking.

When Thompson returned, Detective Myers took
him to McMillan Park, dropped him off, and
returned alone to the parking lot of the restaurant,
where Thompson would meet him with the cocaine.
At McMillan Park, surveillance officers observed
Thompson approach a white Lincoln Continental.
After opening the door and leaning into the
Continental, Thompson walked over to the
petitioner, Keith Wims, who was standing nearby in
the park. The two men embraced and talked for a
few minutes, after which Thompson walked away
and rummaged in a trash can. Shortly thereafter,
Thompson and Detective Myers reconvened outside
the restaurant, and Wims and a companion drove the
Continental to the vicinity of the restaurant. After
briefly stopping in another shop, Wims entered the
restaurant, stood in the window, and observed
Thompson and Detective Myers outside in Myers'
car.

In Myers' car, Thompson produced two ounces of
cocaine, for which Detective Myers gave him
another $1,200. The two men discussed future
deals, with Thompson indicating his "man" had
plenty of cocaine that could be bought at anytime.
Detective Myers gave the appropriate signal to the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Case 3:03-cv-00840 Document 1074 Filed 04/18/03 Page 68 of 114 PageID #: 68

surveillance officers and Thompson, Wims, and Wims' companion were arrested. At the time of his arrest, Wims possessed $3,995 in cash, including the $1,200 that Myers had advanced Thompson earlier that day and a $100 bill from the money which Myers advanced Thompson on July 18, 1989.

**2 Wims, along with Thompson and Dennis, was convicted under a one count indictment of conspiracy to distribute less than 500 grams of cocaine in violation of 21 U.S.C. § 846. At trial, the court denied a joint request by Wims, Thompson, and Dennis that the jury be given an instruction relating to multiple conspiracies.

All three codefendants appealed their convictions to this court, which treated the appeals separately. On appeal, Wims' counsel unsuccessfully argued that insufficient evidence existed to support the conviction, and a panel of this court affirmed his conviction in an unpublished order. *United States v. Wims,* No. 90-1157 (7th Cir. June 19, 1990). Thompson's appellate counsel raised both the issue of the multiple conspiracy instruction and the issue of the sufficiency of the evidence, but to no avail as this court also affirmed his conviction in an unpublished order. *United States v. Thompson,* No. 90-1182 (7th Cir. October 17, 1990).

Unlike his codefendants, Dennis succeeded on the appeal of his conviction. *United States v. Dennis,* 917 F.2d 1031, 1033 (7th Cir.1990). Dennis' appellate counsel raised, among others, the issues of the lack of an instruction on multiple conspiracies and the sufficiency of the evidence. In a published opinion, this court reversed Dennis' conviction, holding that an instruction on multiple conspiracies should have been given and that the evidence was insufficient to show that the three co-defendants were members of a single conspiracy. *Dennis,* 917 F.2d at 1033.

Spurred by Dennis' success, on August 5, 1991, Wims filed a petition seeking relief under 28 U.S.C. § 2255, alleging he received ineffective assistance of counsel because his appellate counsel failed to raise the multiple conspiracy instruction issue. Despite its view that the evidence against him was overwhelming, the district court vacated Wims' conviction, feeling restrained by this court's holding in Dennis' case that the failure to give the multiple conspiracy instruction was a reversible error. This

appeal followed.

II.

The Sixth Amendment provides Wims with the right to effective assistance of appellate counsel. *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830 (1984) ; *Ross v. Moffit,* 417 U.S. 600, 94 S.Ct. 2437 (1974). To succeed in his claim of ineffective assistance of counsel, Wims must satisfy the two-prong standard announced in *Strickland v. Washington:* he must demonstrate both that his counsel's conduct was deficient and that the deficiency prejudiced the result of his proceeding. 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); *United States v. Reiswitz,* 941 F.2d 488, 495 (1991); *United States v. Payne,* 741 F.2d 887, 891 (7th Cir.1984). The failure by Wims' appellate counsel to raise the issue of whether the trial court erred in refusing to give a multiple conspiracy instruction satisfies both of these requirements, and thus violates Wims' right to effective assistance of counsel.

**3 The first prong of the *Strickland* test requires us to determine whether the defendant's assistance of counsel falls below "an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. at 2064. Counsel's conduct is strongly presumed to fall within the reasonable standard of conduct, *Id.;* *United States v. Balzano,* 916 F.2d 1273, 1294 (1990), and in the context of appellate advocacy, counsel need not raise every conceivable argument which is supported by the record. *Evitts,* 469 U.S. at 394, 105 S.Ct. at 835; *Gray v. Greer,* 800 F.2d 644, 647 (7th Cir.1986). However, when "appellate counsel fail[s] to present significant and obvious issues on appeal," his conduct falls below the standard of objective reasonableness. *Gray,* 800 F.2d at 646. "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.*

Counsel for both of Wims' codefendants raised the multiple conspiracy issue on appeal, one successfully. While in prosecuting the appeal he could not have known that this court would reverse Dennis' conviction, Wims' appellate counsel also served as trial counsel. At that time, he recognized that the evidence gave rise to the possibility of multiple conspiracies and requested, along with

counsel for the other defendants, a jury instruction relating to the issue. In denying the requested multiple conspiracy instruction, the court stated that the propriety of such an instruction was a close call and proceeded to explicitly provide the defendants with a record for appeal. Consequently, we conclude that Wims' counsel failed to raise a "significant and obvious issue" on appeal in violation of an objective standard of reasonable assistance.

Under the second prong of the *Strickland* test, we must decide whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068. In other words, if the failure to raise the multiple conspiracy instruction issue may have resulted in a reversal of Wims' conviction or the grant of a new trial, then his counsel's error was prejudicial. *Gray*, 800 F.2d at 646. We are not directly deciding whether if presented with the multiple conspiracy instruction issue, we would have reversed Wims' conviction, but rather we must decide only whether a "reasonable probability" exists that Wims' appeal would have been successful if counsel had raised the issue.

Generally, "the defendant in a criminal case is entitled to have the jury consider any theory of defense which is supported by the law and which has some foundation in the evidence, however tenuous." *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir.1986). In particular, "[i]f the possibility of multiple conspiracies exists, the trial judge must so instruct the jury." *United States v. Kendall*, 665 F.2d 126, 136 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719 (1982). The evidence established that on separate occasions Wims and Dennis supplied cocaine to Thompson, who in turn sold it to Detective Myers. The only evidence linking Wims to Dennis was Thompson's reference to his "man" and the $100 marked bill given to Dennis, but found in Wims' possession. This court concluded that such evidence made possible the existence of multiple conspiracies, rather than the single alleged conspiracy, and therefore Dennis was deprived of a fair trial when his request for a multiple conspiracy instruction was denied. *Dennis*, 917 F.2d at 1033. Since Wims was in the same position as Dennis vis-a-vis Thompson, the evidence

equally raises the possibility that Wims conspired with Thompson, but did not join the larger alleged conspiracy with Dennis. Given the reversal of Dennis' conviction, there is a reasonable probability that Wims' conviction also would have been reversed if his appellate counsel had raised the multiple conspiracy issue on appeal.

**4 Our conclusion that Wims failed to receive effective assistance of appellate counsel does not conflict with this court's unpublished order finding sufficient evidence existed to support his conviction. In *United States v. Grier*, we recognized that the absence of a variance between the conspiracy charged and the conspiracy proven does not dispose of the question of whether the defendant was entitled to a multiple conspiracy instruction. 866 F.2d 908, 931-32 (7th Cir.1989). It would be nonsensical to conclude that a finding that sufficient evidence exists to convict the defendant of a single conspiracy precludes the defendant from presenting to the jury the equally plausible possibility of multiple conspiracies. In examining a challenge to the sufficiency of the evidence, the court must determine whether substantial evidence, including circumstantial evidence, exists to support the conspiracy conviction. *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990). While this court found that the reference to my "man" and the possession of the marked bill from the Dennis transaction were enough to implicate Wims in the alleged conspiracy, this court was not presented with the issue of whether the existence of multiple conspiracies was plausible. While sufficient evidence existed to convict Wims, the evidence presented could also lead an appellate court to conclude, as the court in Dennis' case did, that a multiple conspiracy instruction was mandated.

The conduct of Wims' appellate counsel satisfies both prongs of the test for ineffective assistance of counsel under *Strickland*, and therefore the district court's order vacating Wims' conviction is AFFIRMED.

983 F.2d 1074 (Table), 1992 WL 383299 (7th Cir.(Ind.)), Unpublished Disposition

END OF DOCUMENT

ISSUE #3: Trial Counsel Wilmer "Buddy" Parker was ineffective as Counsel during his Closing Argument to the Jury, when he called his own client, Movant James Gormley, "stupid" and "a jerk" more than 15 times during the Closing argument.  This ineffectiveness prejudiced Mr. Gormley with the Jury and denied him a fair trial.  Although Counsel Parker did not actually come out and concede guilt, he did leave the distinct impression that he did not believe in the innocence of his own client; he ceased to be the advocate guaranteed by the Sixth Amendment to the Constitution.

During closing arguments, counsel should limit himself to addressing the relevant legal issues.  <u>Herring v. New York</u>, 422 U.S. 853, 861-62 (1975).  An incompetent closing argument can constitute ineffective assistance by counsel.  <u>U.S. v. Jordan</u>, 927 F.2d 53, 57 (2d Cir.1991); <u>Mathews v. U.S.</u>, 449 F.2d 985, 987-88, 992-94 (D.C.Cir. 1971);(Ineffective assistance found upon rehearing and convictions reversed); <u>U.S. v. Hammonds</u>, 425 F.2d 597 (D.C.Cir. 1970).  In <u>Loving v. O'Keefe</u>, 960 F. Supp. 46 (S.D.N.Y.1997), the Court declined to find counsel was ineffective, where defense counsel called the prosecutor "a jerk" (only once) in front of the jury.  960 F. Supp. at 51.  "The judge admonished him more than once for making faces and repeating answers in a mocking tone.  But these actions, while unprofessional, did not deprive petitioner of meaningful and effective representation.  <u>Id.</u>  Mr. Gormley suggests that Mr. Parker's conduct in calling his own client "stupid" and "a jerk" in front of the jury, repeatedly and with great emphasis, did cross the line and constitute ineffective assistance of counsel during closing argument, which caused substantial prejudice.  Appellate counsel Mark J. Kalish, Esq. has stated that he is prepared to provide expert testimony about Mr. Parker closing argument when the Court holds an evidentiary hearing on this Motion for Habeas Corpus. An evidentiary hearing is required on claims of ineffective assistance of counsel.  <u>Sneed v. Smith</u>, 670 F.2d 1348, 1353 (4th Cir. 1982).  <u>See also</u>, <u>Kansas v. Carter</u>, 14 P.3d 1138, 1142-1149 (Supreme Court of Kansas 2000) (applying Federal Constitutional

legal standard found in <u>U.S. v. Cronic</u>, 466 U.S. 648, 655-57 (1984)
to reverse defendant's convictions where, among other things, counsel
stated in closing argument that the defendant's "actions were stupid".
14 F.3d at 1143.  In <u>Kansas v. Smith</u>, 11 P.3d 520, 527-30 (Kansas Court
of Appeals 2000), the Court reversed the defendant's convictions and
remanded for a new trial where the prosecutor repeatedly referred to
the defendant as "a liar" during closing argument.

   <u>North Carolina v. Jones</u>, No. 218A00 (North Carolina Supreme Court
February 1, 2002) provides the best discussion Movant has located on
the proper scope and limitations of closing argument.  In <u>Jones</u>, the
defendant's death sentence was reversed (but not his conviction for
first degree murder) where the prosecutor disparaged defendant during
penalty-phase closing arguments by engaging in name-calling and
personal insults.  The court wrote, "(i)n closing arguments to the jury
an attorney may not: (1) become abusive, (2) express his personal belie
as to the truth or falsity of the evidence, (3) express his personal
belief as to which party should prevail, or (4) make arguments premised
on matters outside the record." Id. at 14 (slip opinion).  The Court
goes on for approximately 16 pages of its opinion analyzing cases and
spelling out in detail what is and is not acceptable during closings.
The Court specifically states that inflamatory and prejudicial comments
such as those made by Mr. Parker are not acceptable, and may even
violate ethical standards.  <u>North Carolina v. Smith</u>, 181 S.E.2d 458,
460 (North Carolina Supreme Court 1972) (quoting, <u>Berger v. U.S.</u>, 295
U.S. 78, 88-89 (1935)).  Prosecutor Philip Wright may also have engaged
in misconduct during closing arguments in Mr. Gormley's case (plus his
opening argument comment that Mr. Damron's Gold Eagle coin business
was "a pyramid scheme" despite <u>Holtzclaw</u>).  <u>U.S. v. Wilson</u>, 135 F.3d 291
297-301 (4th Cir. 1998)(setting forth standards for closing misconduct)

This Court should consider the following factors in determining whether the prosecutor has committed misconduct during closing argument: (1) the prosecutors remarks were improper and (2) that they 'prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial.' U.S. v. Adam, 70 F.3d 776, 780 (4th Cir. 1995)(quoting, U.S. v. Mitchell, 1 F.3d 235, 240 (4th Cir.1993)). "We also consider whether the prosecutor's remarks were invited by improper conduct of defense counsel, see, U.S. v. Young, 470 U.S. 1, 12-13 (1985), and whether curative instructions were given to the jury, see, Harrison, 716 F.2d at 1053." Wilson, 135 F.3d at 299. It will be clear to the Court from reviewing the following quotes of Mr. Parker and Mr. Wright, that Mr. Parker's improper conduct did (in a way) invite Mr. Wright's improper remarks to the effect that Mr. Gormley's conduct was criminal conduct, which was the ultimate question of fact before the jury. It is improper per se for the prosecutor to express his opinion concerning the ultimate question before the jury. The Court did not intervene, and no curative instructions were given to the jury. Defense counsel was ineffective during his closing arguments, and the prosecutor also made improper statements during closing argument; in combination, these improprieties along with others raised in the Motion for Habeas Corpus deprived Mr. Gormley to his right to a fair trial and his right to effective defense counsel.

EXCERPTS FROM THE CLOSING ARGUMENT OF DEFENSE COUNSEL BUDDY PARKER:

"First off, I know that you've been watching Mr. Gormley throughout
the Trial, which is appropriate; nothing wrong with that.  And I know
you've been seeing how he has conducted himself in this Courtroom;
and probably one or more of you thinks he looks like a jerk, he acts
like a jerk.  Well, I'm here to tell you, he's a jerk.

The other thing I'm here to tell you is that I told you at the
beginning of this case that he was conducting the practice of law.
I didn't say he was smart.  So I'm also here to tell you he was stupid
in the way he conducted the practice of law.

So, yes , Jim Gormley is a jerk, and Jim Gormley is stupid, but
being a jerk and being stupid doesn't mean that you're a criminal,
because under the Constitution of the United States the Government
has the burden of proving beyond a reasonable doubt that you're a
criminal.  And you're the judges of the facts."
Gormley  Trial Transcript, Vol. XI, pages 102-03.

"So all I'm trying to point out to you is someone's understanding
is not necessarily reciting to you what the other person said.  The
fact is, Jim Gormley did not think it was a good deal.  He told Roger
Damron he'd never seen any of these programs work, but he would check
into this one.

And yes, he met (SEcret Service Agent) David Caruso in the U.S.
Attorney's Office in Atlanta in August (1995).  A five hour meeting.
And you know what?  You could just tell it in David Caruso's -- the
way he testified.  Man, he just loved testifying against Jim Gormley,
because I told you, Jim is a jerk.  He's a jerk and there's nothing
more that a Federal agent likes than to get it to and stick it in the
back of some smart, fancy pants jerk lawyer."
Gormley Trial Transcript, Vol. XI, pages 112-13.

"But I'll bet you Roger Damron believed in this program himself. He liked that $70 million figure down there, you see. But his lawyer, his jerk lawyer in Atlanta wouldn't give him the green light, and Bollin could find any other program, and Damron was getting desparate." Gormley Trial Transcript, Vol. XI, page 117.

"Yes, we do have those conversations of Ralph Touma and Rita Touma with Jim Gormley in November (1995), and I'll be the first to tell you he made some stupid, jerk statements there. He makes stupid jerk statements there. He makes stupid statements in -- excuse me -- in December (1995) because he's trying to cover for Roger, his client. And that was wrong for him to do." Gormley Trial Transcript, Vol. XI, page 122.

"So when Gormley takes that witness stand in this courtroom [during Mr. Damron's October 23, 1997 criminal contempt hearing] and he says, when asked,, "Did Roger Damron direct, orchestrate or coordinate the payments of these monies," he says, "To my knowledge, he did not." "To my knowledge ...."

And you know what? That was another jerk answer by a smart, fancy pants lawyer, but it was literally true, because he told Roger, "Don't do it and I don't want to hear any more about it." And he didn't hear any more about it. He said, "To my knowledge ...". Gormley Trial Transcript, Vol XI, pages 127-28.
Defense Counsel Wilmer "Buddy" Parker's Closing Argument was so inflamatory and prejudicial that the next defense lawyer to give his closing argument, after Mr. Parker had finished, began by saying,

"I think my beginning remarks have changed a little bit. Ramona Holcome is not a stupid jerk. She is not stupid. She may only have a G.E.D. She may not be a high school graduate, but she's

-2-

very bright.  She's very intelligent."

Gormley Trial Transcript, Vol. XI, page 132.

And upon the Governement's rebuttal closing argument, AUSA Phillip H. Wright rammed Mr. Parker's "stupid jerk" closing down Mr. Gormley's throat with the Jury:

"I suppose if you practice law long enough, you're going to see a lot of strange things.  I've never seen a defense lawyer come in here and as his defense say his client is a stupid jerk, but that's all he is; he's not a crook.

Well, I agree with Mr. Parker that Mr. Gormley has done some stupid things, and the jails are full of people who have done stupid things   And in those cases and in this case, those stupid acts are criminal acts."

Gormley Trial Transcript, Vol. XI, page 185.

There can be little doubt from the "stupid jerk" comments Mr. Parker made about his own client during his closing argument that he had ceased to function as the professional advocate contemplated by the Sixth Amendment to the Constitution.  Mr. Parker's performance in his closing argument can only be characterized as ineffective assistance of counsel, of a very high order.  When Mr. Parker's "stupid jerk" closing argument is combined with his failure to request any Jury instructions concerning his sole theory of defense (Just practicing law ... within legally and ethically acceptable parameters, including the "safe harbor" from prosecution for obstruction of justice set forth in 18 U.S.C. § 1515(c)), the Court should find that Mr. Parker was ineffective as Mr. Gormley's Trial Counsel, and Mr. Gormley was prejudiced thereby.

-3-

ISSUE # 4: The Government engaged in gross prosecutorial misconduct by visiting with Roger Damron at the South Central Regional Jail in October/November 1997, without his defense counsel present, and threatening to indict his wife, Fae Damron (who was not then or ever under indictment) unless he immediately pleaded guilty and cooperated with the Government. The Government failed to disclose its misconduct despite the requirements of Brady v. Maryland, Giglio, Agurs, Bagley and the Jencks Act, so that Mr. Gormley's defense counsel could more thoroughly examine Mr. Damron about it at trial. Such Government misconduct is grounds for vacating both Mr. Gormley's and Mr. Damron's convictions. Furthermore, the Government committed misconduct by failing to disclose to the Court that Mr. Damron could not have faxed a copy of the Court's March 17, 1996 Ex Parte Restraining Order to Mr. Gormley, as Mr. Damron testified at Mr. Gormley's trial, because, as Government counsel and F.B.I. Agent Jim Wise wellknew, Mr. Damron was not himself served with the Ex Parte Restraining Order until about a week after March 17, 1996. Napue v. Illinois, 360 U.S. 264, 269 (1959). The prosecutors and Agent Wise knew when Mr. Damron was actua served with the Restraining Order because Agent Wise served it upon Mr Damron and testified about it under examination by Mr. Wright and Miss Bettss at Mr. Damron's criminal contempt hearing before Judge Goodwin on October 23, 1997. Thus, the prosecutors breached their duty of candor to the Court, U.S. v. Shaffer Equipment Co., supra. Furthermore the Government failed to produce in discovery the long distance facsim records from Mr. Damron's dedicated home office fax line, even though trial counsel filed appropriate motions requesting all such evidence. All of the documents in the record sent by Mr. Damron to Mr. Gormley in Atlanta (generating a long-distance toll record) were sent from Mr. Damron's home office fax line and bear a fax header so indicating. With those fax long distance records, trial counsel could have either refreshed Mr. Damron's recollection, impeached him, or shown that he was mistaken. This failing is in addition to the Government's failure to disclose Mr. Damron's false testimony when he gave it at trial, since the prosecutors and Agent Wise (who was the Case Agent in the Courtroom) all knew that Mr. Damron had not even been served with the Ex Parte Restraining Order until many days after the March 17, 1996 date that he testified he had faxed it to Mr. Gormley. The truth is that Mr. Damron never faxed that Order to Mr. Gormley, but, rather, simply told Mr. Gormley that there was a Court Order requiring him to report his monthly income and expenses to the Court, which he and his counsel of record were taking care of. Mr. Gormley never saw the Order until Mr. Damron's Court-appointed counsel Jack Laishley, Esq. faxed the Order to Mr. Gormley in 1998. It was that copy of the Order, bearing Mr. Laishley's law firm fax header, "Laishley & Booten" that was found and seized during the search of Mr. Gormley's law office in August 1998 (copy attached). This pervasive prosecutorial misconduc denied Mr. Gormley a fair trial and is alone sufficient for this Court to grant him a Writ of Habeas Corpus. SEE, Boyle v. Million, 201 F.3d 711, 717-18 (6th Cir. 2000). The Government has the long dist fax records for Mr. Damron's home office line; they were seized along with the voice line records that were turned over in discovery, when the F.B.I. searched Mr. Damron's home in February 1996. Mr. Gormley can not produce them to the Court because the Government wrongfully withheld them, and only a subpena could cause the phone company to produce them, if they still have them in their files. Supporting case authorities and arguments follow.

There can be no doubt but that it is a high form of prosecutorial
misconduct for prosecutor(s) to go to the jail to meet, alone, with
a defendant to negotiate a plea bargain, even if the defendant's
attorney' knows about the visit and approves of it.  Anderson v.
State of North Carolina, 221 F. Supp. 930, 934-35 (W.D.N.C. 1963);
U.S. v. Lopez,  765 F. Supp. 1433, 1456-63 (N.D.Cal.1991); Massiah v.
U.S., 377 U.S. 201 (1964).  It is another issue that the prosecutors
procured Mr. Damron's plea bargain and agreement to cooperate by
threatening to indict his wife, Fae, for money laundering unless
Mr. Damron immediately pleaded guilty and agreed to cooperate with
the Government.  U.S. v. Nuckols, 606 F.2d 566, 569-70 (5th Cir. 1979)
Mrs. Damron had not yet been indicted by a grand jury (indeed, she ne
was indicted), so there had not been any finding of probable cause
for the prosecutor(s) to base their threat on concerning Mrs. Damron.
"Recognizing, however, that threats to prosecute third persons can
carry leverage wholly unrelated to the validity of the underlying
charge, we think that prosecutors who choose to use that technique
must observe a high standard of good faith.  Indeed, absent probable
cause to believe that the third person has committed a crime, offerin
'concessions' as to him or her constitutes a species of fraud.  At a
minimum, we think that prosecutors may not induce guilty pleas by
means of threats which, if carried out, would warrant ethical censure.
Cf. U.S. v. Lovasco, 431 U.S. 783, 791 (1977); American Bar Associatio
Code of Professional Responsibility DR 7-103(A) (Rev. Ed. 1975).
The question of good faith is, however, governed by federal standards,
cf. Perez v. Ledesma, 401 U.S. 82, 85 (1971), and its absence in plea
bargaining may be determined independantly of ethical considerations."
U.S. v. Nuckols, 696 F.2d at 669-70.  Compare, Harmon v. Mohn, 683
F.2d 834 (4th Cir.1982) (Appellant denied 2254 Habeas Corpus where

the Government conditioned his plea agreement to the Government's
willingness to dismiss the pending (probable cause had already been
found) indictment against his wife, for allegedly aiding and abetting
him in committing rape); U.S. v. Pollard, 959 F.2d 1011, 1020-21
(D.C.Cir. 1992) (collecting cases from six Circuits); Ames v. U.S.,
155 F. Supp. 2d 527 (E.D.Va. 2000) (2255 Motion denied). All of
those cases, however, involved wives who were already under
indictment, which distinguishes them from the Damrons' situation.
Furthermore, all of the husbands' attorneys were present at the
time the plea bargain involving the wife was proposed to the husband,
which further distinguishes Mr. Damron's situation. Mr. Gormley
has written the Administrator of the South Central Regional Jail,
where Miss Betts visited and threatened Mr. Damron without his
attorney present between approximately October 25, 1997 and November
15, 1997, but was informed that the records can only be disclosed in
response to a judicial subpoena. Mr. Gormley has already raised
this issue in his Motion for a New Trial, based upon Newly Discovered
Evidence. In its Response Brief to that Motion, tellingly, the
Government does not deny (and thus tacitly admits) that Miss Betts
did in fact meet with Mr. Damron outside the presence of counsel
and threaten him with the indictment of his wife, Fae, unless he
pleaded guilty and cooperated with the Government. In its Response
Brief, the Government merely says that it is immaterial that the
Government failed to disclose these matters to Mr. Gormley's counsel
in discovery in his case, since Mr. Parker did examine Mr. Damron
about the fact that he pleaded guilty to save his wife. Fourth
Circuit precedents, relying on Supreme Court decisions, contradict
the Government's assertion. Campbell v. Reed, 594 F.2d 4 (4th Cir.

1979); U.S. v. Sutton, 542 F.2d 1239 (4th Cir. 1976); U.S. v. Kelly, 35 F.3d 929 (4th Cir. 1991); U.S. v. Smith, 77 F.3d 511 (D.C.Cir. 1996).  Mr. Damron's testimony only covered the threats made against Mrs. Damron by Miss Betts; it did not cover the fact that she made these threats without Mr. Damron's attorney present, in violation of the Sixth Amendment, which was an important extra detail for the Jury to have considered, had it properly been disclosed to defense counsel.  Mr. Damron's responses to Mr. Parker's cross examination on this issue can be found at Trial Transcripts, Vol. II, pages 256-261.  In Harmon v. Mohn, the Circuit Court noted:

> "the Supreme Court has left open the question of plea bargains which involve third persons.  In Bordenkircher v. Hayes, 433 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) the Court mentioned this problem without deciding it.  See n.8, page 364, 98 S.Ct. n. 8, page 668:
>
>> 'This case does not involve the constitutional implications of a prosecutor's offer during plea bargaining of adverse or lenient treatment for some person other than the accused, see, ALI Code of Pre-Arraignment Procedure, Commentary to section 350.3, pp. 614-15 (1975), which might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider, Cf. Brady v. U.S., 397 U.S. 742, 758 (90 S.Ct. 1463, 25 L.Ed.2d 747)' (emphasis in original)."

683 F.2d at 836-37 (4th Cir. 1982).

What appears to have gone on here it a travesty of Justice, both for Mr. and Mrs. Damron, and for Mr. Gormley.  Regardless of the Court's disposition of this issue on Mr. Gormley's Motion for Habeas Corpus, the Court should investigate these allegations and report them to the West Virginia Bar Association and the Office of Professional Responsibility and/or the Civil Rights Division of the U.S. Department of Justice.  Keep in mind, Mrs. Damron was never indicted, and Mr. Laishley does not appear to have been present when Miss Betts first made the threat against Mrs. Damron to Mr. Damron.  U.S. v. Omni International Corp., 634 F. Supp. 1414, 1438 (D.Md. 1986), U.S. v.

Derrick, 163 F.3d 799, 808 (4th Cir. 1998); U.S. v. Taylor, 966 F. Supp. 622, 658 (D.S.C. 1997); U.S. v. Wallach, 935 F.2d 445, 457 (2d Cir. 1991); U.S. v. Ming He, 94 F.3d 782, 789-95 (2d Cir. 1996).

Another instance of prosecutorial misconduct in Mr. Gormley's case occurred when the prosecutors and F.B.I. Agent Jim Vise failed to inform the Court or defense counsel that Mr. Damron had falsely testified that he had faxed the March 17, 1996 Ex Parte Restraining Order issued by Judge Goodwin to Mr. Gormley on March 17, 1996, which Mr. Damron testified was the day he received it. ~~Trans.~~ Trans.

Vol II, p. 250, lines 12-15.

pp. ~~84-85~~.  Miss Betts, Mr. Wright and Agent Vise all knew that Mr. Damron's testimony was false, because they all knew from Agent Vise's testimony at Mr. Damron's October 23, 1997 Criminal Contempt Hearing before Judge Goodwin (which was prosecuted by Miss Betts and Mr. Wright) that Agent Vise did not serve the Ex Parte Order on Mr. Damron until several days after Federal Public Defender Edward Weis was appointed by the Court to represent Mr. Damron on March 20, 1997.  Agent Vise testified at the October 23, 1997 Hearing about when he had personally served the Restraining Order in response to questions posed to him by Assistant U.S. Attorney Philip Wright. Copies of pages 84-85, showing the relevant questions and answers, from the 10/23/97 Hearing Transcript, as well as a copy of Judge Goodwin's March 20, 1997 Order appointing Mr. Weis are attached hereto for the Court's convenience.  Interestingly, that was the same Hearing giving rise to Mr. Gormley's conviction for perjury, but Mr. Gormley had completed his testimony before Mr. Wright questioned Agent Vise, in Miss Betts' presence, and exited the Court. When Mr. Damron testified at Mr. Gormley's November 1998 Trial that he had faxed the Ex Parte Order to Mr. Gormley on March 17, 1997, the prosecutors and Agent Vise all knew that the testimony was false; Mr. Damron

could not have faxed Mr. Gormley on March 17, 1997 with a Court
Order that had not yet been served upon him, and was not served
upon him until perhaps a week later by Agent Vice. The Government
had a duty, under these circumstances to bring to the attention of
the Court and defense counsel Mr. Damron's false testimony but they
did not do so. <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959). By
failing to disclose that Mr. Damron's testimony on this critical point
was false, the Government violated Mr. Gormley's right to a fair
trial and denied him due process of law. It is a well-settled
principle that "a conviction obtained by the knowing use of perjured
testimony is fundamentally unfair, and must be set aside if there is
any reasonable likelihood that the false testimony could have affected
the judgment of the jury." <u>U.S. v. Agurs</u>, 427 U.S. 97 (1976);
<u>U.S. v. Bagley</u>, 473 U.S. 667, 678-79 (1985); <u>U.S. v. Kelly</u>, 35 F.3d
929 (4th Cir. 1991); <u>Campbell v. Reed</u>, 594 F.2d 4 (4th Cir. 1979);
<u>U.S. v. Young</u>, 17 F.3d 1201, 1203-04 (9th Cir. 1994); <u>Hillman v.
Hinkle</u>, 114 F.Supp.2d 497, 501-02 (E.D.Va. 2000); <u>U.S. v. King</u>, 232
F.Supp.2d 676 (E.D.Va. 2002) (evidence of false testimony from principal
prosecution witness warranted new trial). Furthermore, the Government
failed to turn over to Mr. Gormley's counsel in discovery the long
distance telephone bills for Mr. Damron's home office fax line (which
is the location from which he always faxed Mr. Gormley; see fax headers
on all Damron documents in evidence), which would demonstrate that
Mr. Damron did not fax the <u>Ex Parte</u> Restraining Order to Mr. Gormley
on March 17, 1997, as he had testified. The Government obtained
those long distance phone records, because they turned over to Mr.
Gormley's counsel Mr. Damron's home voice line records, but not the
fax records. <u>U.S. v. Agurs</u>, <u>supra.</u>, <u>U.S. v. Bagley</u>, 473 U.S. 667

(1985); Brady v. Maryland, 373 U.S. 83 (1963); Kyles v. Whitley,
514 U.S. 419 (1995); U.S. v. Morris, 721 F.Supp. 422, 434-435 (E.D.Va.
1991). This is additional but related misconduct justifying vacating
Mr. Gormley's convictions and granting his Motion for Habeas Corpus.

There is yet another piece of prosecutorial misconduct that Mr.
Gormley wishes to bring to the Court's attention. On July 26, 1999,
the Court held a Hearing on Mr. Gormley's Motion to Suppress the
Evidence Seized from his law office during the August 1998 search.
At that Hearing, Mr. Bryant examined I.R.S. Special Agent Mildred
Williams as follows: [by Mr. Bryant]

Q.    You are Mildred Williams and you are a Special Agent with the
Criminal Investigation Division of the I.R.S.; is that correct?

A.    That is correct.

Q.    Stationed where?

A.    Parkersburg, West Virginia.

Q.    And, Ms. Williams, you were the affiant on the affidavit by which
the Government obtained a search warrant in the Northern District of
Georgia to search Mr. Gormley's law office; is that correct?

A.    That is correct.

Q.    And did you write that affidavit up yourself?

A.    Yes, I did.

July 26, 1999 Hearing transcript at page 4.

Miss Williams lied when she testified that she had written up the
search warrant affidavit herself, and Mr. Wright knew she lied, but
failed to disclose it to the Court. The bottom of each page of the
affidavit bears a word processing footer, "n:/udd/dhess/gjw/general/
office.nbi." "dhess" appears to be Dorothy Hess, a secretary in the
U.S. Attorney's office who did work for Philip Wright, the Assistant
U.S. Attorney in the Courtroom on July 26, 1999. It thus appears

that the search warrant affidavit was actually written by Mr. Wright,
not by Miss Williams, as she testified.  Mr. Bryant was formerly an
Assistant U.S. Attorney for 12 years.  He has stated that when he
worked for the U.S. Attorney's Office for the Southern District of
West Virginia, all such search warrant affidavits were prepared for
Government Agents, like Miss Williams, by the Assistant U.S. Attorneys,
not by the Agents themselves.  A simple reading of the affidavit by
the Court reveals that it sounds like it was written by an attorney.
And certainly Ms. Hess, the secretary who actually prepared the word
processing, can tell the Court who actually wrote it, Miss Williams
or Mr. Wright?  Furthermore, according to Mr. Bryant, an affidavit of
that length [38 pages, 104 paragraphs +/-], would have gone through
10 to 15 drafts, each bearing hand-written changes and notations,
which would also indicate the true writer; the Government should still
maintain the draft file, which the Court can review in camera, unless
it has been destroyed to cover up Miss Williams' lie.  Mr. Wright's
duty of candor to the Court required him to disclose Miss Williams'
lie, but he did not do so.  See, U.S. v. Shaffer Equipment Corp.,
796 F. Supp. 938 (S.D.W.Va. 1992), aff'd in part, vacated in part,
11 F.3d 450 (4th Cir. 1993), on remand, 158 F.R.D. 80 (S.D.W.Va.1994).
Mr. Gormley had a right to know about Miss Williams' lie, since she
later testified as a witness at Mr. Gormley's trial, and such
information could have been used to impeach her veracity and reputation
for honesty, particularly since juries generally give substantial
credability to the testimony of Government Agents.  Mr. Wright's
failure to disclose to the Court and to defense counsel that his witness
had lied about writing the search warrant affidavit herself makes
additional prosecutorial misconduct in this trial.  Giglio.  It is
also a serious ethical lapse by Mr. Wright that should be reported
to the West Virginia Bar Association and to the Office of Professional

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

CRIMINAL ACTION NO. 3:97-00016

vs.

ROGER A. DAMRON,

Defendant.

O R D E R

The above-named defendant, having been found to be indigent and entitled to appointment of counsel under the Criminal Justice Act based upon the CJA-23 Financial Affidavit submitted by the defendant on March 17, 1997, it is **ORDERED** that the Federal Public Defender, (Edward H. Weis, First Assistant Federal Public Defender) 1021 United States Courthouse, Charleston, WV 25301, Telephone No. 304/347-5165, is hereby **APPOINTED** to represent the defendant in this action.

The Clerk is directed to send a copy of this Order to the defendant and counsel, United States Attorney, United States Marshal, United States Probation and Judge Goodwin.

ENTER:       March 20, 1997

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

Wise - Direct

1  calls Agent Wise.

2          THE COURT:  Mr. Wise.

3          JAMES D. WISE, GOVERNMENT'S WITNESS, SWORN

4          THE COURT:  Just give me one second here.

5      All right, sir.

6                    DIRECT EXAMINATION

7  BY MR. WRIGHT:

8  Q.   Please state your name.

9  A.   James D. Wise.

10 Q.   Are you employed?

11 A.   Yes.

12 Q.   How are you employed?

13 A.   I'm a Special Agent with the Federal Bureau of

14 Investigation.

15 Q.   Are you responsible for investigating, among other

16 matters, the case involving Roger Damron?

17 A.   Yes, I am.

18 Q.   Are you familiar with the ex parte restraining order

19 entered by this Court on March 17th, 1997 and which is marked

20 as Government's Exhibit 1?

21 A.   Yes, I'm aware of that.

22          MR. WRIGHT:  May I approach, Your Honor?

23          THE COURT:  You may.

24 BY MR. WRIGHT:

25 Q.   Agent Wise, I've handed you what has been marked as

Wise - Direct

1   Government's Exhibit 1.  Do you recognize that?

2   A.   Yes, I do.

3   Q.   Is that the ex parte restraining order of March 17?

4   A.   Yes, it is.

5   Q.   Did you have anything to do with serving that order on

6   the defendant?

7   A.   Yes.  I served it myself.

8   Q.   And about when did you do that?

9   A.   I served it within one or two days subsequent to the date

10  Mr. Weis, Ed Weis, was advised he was the attorney for

11  Mr. Damron.

12  Q.   How is it you remember that particular time frame?

13  A.   When I served him the order, he advised me that he was

14  now represented by Mr. Weis and he was concerned about that

15  because he thought we had the same last name.  And I assured

16  him that we were not related.

17  Q.   Where did you serve it?

18  A.   At his residence at 525 West 26th Street here in

19  Huntington.

20  Q.   Agent Wise, have you also conducted a search at Agent --

21  at Mr. Damron's home?

22  A.   Yes, I did.

23  Q.   And when was that search conducted?

24  A.   February 19 --

25               MR. LAISHLEY:  Objection, Your Honor; relevancy.

October 3, 2002

Dear Mrs. Gormley,

I have fond memories of your son.  Over the years many lawyers have done legal work for me for the various business ventures I'm been in.  None of them were as easy to talk to as Jim.  If he were a physician it would be said that he had a good bedside manner.  I found him to have a keen legal mind, to insist that you obey the law, and to try diligently to find a way within the law to help you accomplish what you want to do.  I felt he would go far in his chosen field.  I feel especially sorry for him because of his recent marriage and young children, and, I mourn for him for this unnecessary delay in services he could be providing to his clients.  I admire his willingness to help other unfortunate inmates who are in the same boat as he, and I sincerely hope he can somehow find a legal way out of this mess.

I have spoken to my wife about Laishley's whereabouts when I was blackmailed by Miss Betts.  Fae was in the front lobby area waiting to be called to come and visit me when the meeting was going on that resulted in me agreeing to take a plea.  She remembers Laishley coming out grinning from ear to ear.  It meant my case was nearly over without him having to prepare a defense, and he'd get paid.

My memory tells me that I called Laishley and ask him to help me find a technicality I could plea to, or they were going to kill Fae, which leads me to believe that he wasn't there at the moment of the initial threat.  He could, however, have been there.  It seems to me I ask for time to talk to Fae about it before I decided, and my call to him was to tell him of the decision to plea, so help me find something in it I could agree was wrong to do.

My difficulty in remembering is due to several factors:  I am approaching my 65th birthday, all of this took place 5 years ago, and it was a horrible nightmare I have tried to put out of my memory bank.  Another complication in trying to remember precisely lies in the fact that I many debriefing meetings with the Alphabet Gang (FBI,IRS, US Att, Ast.US Att.) so it all sort of runs together looking back.  Add to all of that the fact that when Laishley was there he really wasn't there.  I was alone at the table, with the 4 members of the Alphabet Gang on the other side.  Where was Laishley?  He was lying on the floor over in the corner on the other side of the room, on his back looking up at the ceiling, or sometimes even with his eyes shut.  The only way I know to be sure of who was there when is to get the records from SCRJ where they sign in & out — and hope those records have not been doctored to protect the enemy camp during the time lapse between then and now.

(1)

I have been in over 61 months now. My sentence was for 87, which translates to 76 after the deduction of good time, which means I'm down to less than 15 months to go – probably 10 more here and then 5 in a half-way house. So, this nightmare is nearly over for me.

It occurs to me that if Judge Goodwin sees the difference in the testimony I gave at Jim's Trial (which is the way it was) and what Laishley coached me to say at my Plea Hearing (or they'd lock Fae up, and give me 15 years) that he could consider a perjury charge against me, and give me more time. Hopefully, instead of that he'd go after the truly bad guys in this and get them for the way they did me. I was forced to do what Abraham did before Abimelech, king of Gerar (Gen.20:2), and what his son Isaac also did in Gerar (Gen.26:7), but in my case it was in obedience to Ephesians 5:25.

I will not be allowed to engage in marketing during the 3 years I'll be on paper, so I am instead planning to get into manufacturing. Find a need and fill it, is one formula for making money. There is a great need for electricity in this country. A 96 law requires Electric Utility Co's to buy any excess you have when you are generating your own. If you'll make it, they will run their lines to you and take it. AEP has offered me $2.26/KWH on peak and $1.44 off peak, for an average of almost $1.92 (14 on & 10 off). I've looked into Solar, Diesel, Natural Gas, Wind, Wave, Trash Incenterators, etc. – ways of turning water to steam to run the Turbines. One example of the profitability would require $500,000 for land, building, generators, switch gear, labor, fuel, & operating capital, and would produce a gross of $1,368,000 per month. It can be gotten into for less or more, depending on available $ and ambition. I wanted Jim to know about this to give him a ray of hope for the future. I would welcome him anytime and in whatever capacity he'd wish and could meet the requirements for ( I see no problem in his case of meeting any of them). I recently saw a Video about the need for electricity, and they say that someone needs to build 2 Twin Tower Power Plants per week for the next 30 years just to keep up with the demand, so the need is very great. The way I plan to do it can be accomplished in 30 days approximately, as opposed to Power Plants that take years to build. I'm now looking into where can I borrow the $ to do this (government programs, grants, loans, assistance available to X-felons, etc.). I know individuals that could loan it, but there terms per KWH may not be as attractive as a loan from the government. Jim would be most useful to me with all the technicalities I must figure out about this. Give him my best.

Love To All,

Roger A. Damron

Cupp v. Naughton, 414 U.S. 141, 147 (1973)
Standard for Jury Instruction issues on
collateral review.

ISSUE #5: Trial counsel was ineffective
for failing to request a jury instruction about
"expressio unius est exclusio alterius",
to form a basis for the jury to acquit Mr.
Gormley of conspiracy to commit money
laundering and conspiracy to commit obstruction
of justice, concerning the advice Mr. Gormley
had given the Damrons about receiving a loan
from Mr. Bollin, who had received the money
from Mr. Oles, in the Spring of 1997. At trial,
the evid Mr. Damron testified that he was
apprehesive about borrowing the money himself
because he would have to report it to the
Court, according to the terms of the Court's
March 17, 1996 Ex Parte Restraining Order.
Mr. Damron called Mr. Gormley in Atlanta and
requested his legal advice, Mr. Gormley, who
had not seen a copy of the Court's Order, asked
Mr. Damron whether his wife, Fae Damron, had
any Court Ordered reporting requirement, and
Mr. Damron replied that she did not, Mr. Gormley
then recommended that Mrs. Damron borrow
the money instead of Mr. Damron, and stated
that the loan should be properly documented in
a written Promissory Note, bearing a reasonable
rate of interest (Damron used 7%), so that
there would be no misunderstanding about who

Gormley's legal advice, and Mrs. Damron signs
a Promissory Note that Mr. Damron prepared.
The Bollins sent the money to Mrs. Damron.
When Mr. Damron told Mr. Bollin that he would
send him Mrs. Damron's Promissory Note, Mr.
Bollin said it was not necessary, and that
he did not want it, so Mr. Damron tore up
the original of the Note and threw it away.
Notably, Mr. Damron never told Mr. Gormley
that he had torn up Mrs. Damron's Note
and thrown it away. The Government argued
at trial that Mr. Gormley's advice about Mrs.
Damron borrowing the money instead of Mr. Damron
to avoid Mr. Damron's Court reporting requirement
constituted conspiracy to obstruct justice.
The jury, however, was never instructed
about the "safe harbor" from obstruction of
justice for attorneys, which is contained in
18 U.S.C. section 1515(c). Section 1515(c)
which constituted an element of the offense,
was also omitted from the indictment, which
was a jurisdictional defect. Furthermore,
trial counsel was also ineffective in failing to
request a jury instruction concerning the legal
principle of "expressio unius est exclusio
alterius", which is defined as follows:
    "A canon of construction holding that to

express or include one thing implies the
exclusion of the alternative. For example,
the rule that 'each citizen is entitled to
vote' implies that non-citizens are not
entitled to vote. Also expressed as
'inclusio unius est exclusio alterius',
expressum facit cessare tacitum."
Cf., Ejusdem generis, noscitur a
sociis; rule of rank."

Black's Law Dictionary (7th Edition) West
Group 1999 at page 602.

As applied to the Damrons' situation vis-a-vis
Mr. Damron's court-ordered reporting require-
ment (as Mr. Damron explained it to Mr. Gormle
who had not seen the actual Court Order), the
above referenced principle means that because
the Order only imposed a reporting requireme
on Mr. Damron, implicitly, Mrs. Damron had n
requirement to report the money she borrow
from the Bollings and because she was the real
borrower, Mr. Damron had no obligation report
loan made to his wife either. Obviously, the
Government does not favor Mr. Gormley's lega
analysis of the situation, but it is a bona
fide legal analysis, supported by the principle

which shows that Mr. Gormley had no criminal intent. Even if his legal advice was misguided or incorrect, nevertheless, it was bona fide legal advice, and the jury should have been instructed about the Section 1515(c) "Safe harbor" for bona fide legal advice and the principle of "expressio unius est exclusio alterius." Trial counsel's failure to request these jury instructions prejudiced Mr. Gormley with the jury, which might easily have acquitted him had they been properly instructed.

Another, related, area of ineffectiveness by trial counsel was that counsel sent a copy of Mr. Gormley's hand-written notes to the Pre Sentence Investigative Report on the issues referenced in this section directly to the Court for Judge Chambers' consideration, without Mr. Gormley's permission, in violation of the attorney-client privilege. Mr. Gormley's hand-written notes to the P.S.I. were privileged communications to counsel, which should not have been copied and sent to the Court without Mr. Gormley's permission.

Finally, because Mrs. Damron was acting upon the advice of counsel in borrowing the money from the Bollins, which advice the

indict Mrs. Damron for money laundering unless
Mr. Damron pleaded guilty and agreed to
cooperate with the Goverment could not have
been in good faith. See also, U.S. v. Orchada-
Peralta, 318 F.3d 255 (1st Cir. 2003)
(convictions of drug dealer's wife for conspiracy
to commit money laundering reversed).

    Based upon the above-referenced
ineffective assistance by Mr. Gormley's trial
counsel, which caused prejudice, this Court must
vacated Mr. Gormley's convictions and grant
him a new trial and/or dismiss the indictment.

ISSUE #6 : Trial counsel was ineffective at sentencing because he failed to make Motion for a Downward Departure, below the Guidlines Range, as MR. Gormley specifically requested. Furthermore trial counsel was ineffective for failure to have MR. Gormley prepare, execute, file and submit to the Probation Officer the Financial Affidavit required by 18 U.S. Code section 3664(d)(3). This was a critical error by trial counsel, since "(t)he burden of demonstrating the financial resources of the defendant and the financial needs of the defendant dependants, shall be on the defendant." 18 U.S. Code section 3664(e). Section 3664(a) also provides, "(f)or orders of restitution under this Title, the Court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the Court may direct, information sufficient for the Court to exercise its discretion in fashioning a restitution order. The report shall Include, to the extent practicable, a complete accounting of the losses of each victim, any restitution owed according to a plea agreement, and information relating to the economic circumstances of each defendant. ...". Section 3664(d)(3) also provides:

"Each defendant shall prepare and file with the Probation Officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the defendant's dependants (emphasis added), and such other information that the Court deems appropriate."

Mr. Gormley's trial counsel failed to inform him of the section 3664(d)(3) requirement to provide a financial affidavit to the Probation Officer, who merely interviewed Mr. Gormley. In ordering that restitution was immediately due and payable in the amount of $783,534, the Court failed to consider that Mr. Gormley could not pay that amount (or even 1/10 of it) in the reasonably foreseeable future, and the impact it would have on Mr. Gormley's dependants, particularly his daughter, Kathleen, who was only 7 months old when Mr. Gormley was sentenced on May 1, 2000. Because the Court made $783,534 due and payable, that full sum began accruing interest immediately, and as it

* failing to object to the Court

March 13, 2003, the interest amount alone is $136,923.58. These staggering amounts virtually ensure that Mr. Gormley will remain a debt peon for the rest of his natural life, and that he is unable to provide for the support and care of his young daughter, Kathleen. One district court did address a similar situation, See, U.S.v. Harris, 60 F. Supp. 2d 169, 178-79 (S.D.N.Y. 1999), U.S.v. Aramony, 166 F.3d 655, 665-66 (4th Cir. 1999). Trial counsel's failure to object to the Court making the full amount of restitution due and payable immediately has severely prejudiced Mr. Gormley and his dependant daughter. Trial counsel further prejudiced Mr. Gormley by making his restitution due and payable ~~at~~ at a minimum rate of $100.00 per month. It is not clear from where or how the Court expects Mr. Gormley to pay $100.00 per month while incarcerated, when the Bureau of Prisons only pays him $5.25 per month for his prison labor. As a result of Mr. Gormley's inability to pay $100.00 per month while in prison, he has been placed in "refusal status" in the Inmate Financial Responsibility Program, which means that he cannot shop at the prison commissary except

for $25.00 per month of hygiene items (the normal inmate can purchase up to $290.00 per month, including food items and clothing), and Mr. Gormley is compelled to sleep in a 10-man cell (only 12'x 20'), where he has only about 45 square feet of living space (and no desk for legal work). Notably, the Bureau of Prisons own Program Statement, "Rated Capacities of Bureau Facilities" specifies that in an F.C.I, inmates are supposed to have at least 70 square feet of space each. And in the *Harris* case, *supra*, the Court only ordered him to pay $35.00 per month while incarcerated, even though he owed $200 million of restitution. Some judges would not have ordered any minimum monthly payments until after a defendant was released from incarceration. Trial counsel's failure to object to the minimum $100.00 per month payments while Mr. Gormley is incarcerated has prejudiced him, as shown by his being placed in "refusal status" in the Inmate Financial Responsibility Program while incarcerated. *Williams v. Taylor*, 146 L.Ed.2d 389 (2000); *Glover v. U.S.*, 148 L.Ed.2d 604 (2001). If the convictions giving rise to the restitution remain valid

following the Court's consideration of this Motion for Habeas Corpus, nevertheless, the Court should vacate MR. Gormley's sentence, and re-sentence him due to trial counsel's ineffective assistance during the sentencing phase, which has prejudiced MR. Gormley. See also, (132) Breckenridge v. U.S., 93 F.3d 136 (4th Cir. 1996).

MR. Gormley's trial counsel was also ineffective at sentencing because he failed to make a Motion for a Downward Departure, below the Guidelines range, as MR. Gormley had requested, even though MR. Gormley supplied MR. Parker with case citations. Under certain circumstances, it is within the Trial Judge's power to depart below the Guidelines range at sentencing. 18 U.S.C. section 3553(b) U.S.S.G. section 5K2.0, Koon v. U.S., 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996.) For example, in U.S.v. Restrepo, 936 F.2d 661, 667 (2d Cir. 1991), the Court departed downward in a money laundering case because the amount of money involved in the fraud scheme had little relation to the defendant's role in the offense. See also, U.S.v. Walters, 87 F.3d 663, 671 (5th Cir.

1996); <u>U.S. v. Caba</u>, 911 F. Supp, at 635-636 (E.D.N.Y. 1996) [money laundering and food stamp fraud case]; <u>U.S. v. Smith</u>, 186 F.3d 290, 297 (3d Cir. 1999); <u>U.S. v. Woods</u>, 159 F.3d 1132 (8th Cir. 1998); <u>U.S. v. Hemmingson</u>, 157 F.3d 347 (5th Cir. 1998) affirming <u>U.S. v. Ferouillet</u> 1997 WL 266627 at *7 (E.D. La. 5/20/97) (election fraud and money laundering case); <u>U.S. v. Rostoff</u>, 53 F.3d 398, 411-12 (1st Cir. 1995). In <u>Rostoff</u>, which is a finely written piece of legal scholarship, the Court made substantial downward departures in sentencing defendants for bank fraud and making false statements. U.S.S.G. section 2F1.1, comment n.11 [total dollar loss that results from the offense may overstate its seriousness]. The First Circuit upheld the following downward departures as "within acceptable bounds (if barely)." 53 F.3d at 412: Defendant Harris' GSR of 27-33 months reduced to 9 months incarceration; Defendant Bongiuto's GSR of 33-41 months reduced to probation; and Defendant Di Cologero's GSR range of 27-33 months reduced to probation. See, Table at 53 F.3d 409 n.9. Rostoff

also, cites to several other Circuit Court opinions where substantial unguided downward departures have been affirmed, 53 F.3d at 411. It would also have been possible for the Court to have departed downward on the restitution amount of $783,534. See U.S. v. Van Brocklin, 115 F.3d 587, 602 (8th Cir. 1997). In Van Brocklin, the Court held that a "secondary figure" in the crime who had reaped only a small benefit from the scheme could not be subjected to a disproportionate forfeiture, judgment and restitution order. Given that this Court found at sentencing that Mr. Gormley had played only a minor role in the crimes, he appears to fall squarely within the parameters of the Eighth Circuit's holding in Van Brocklin, so he was prejudiced by trial counsel's failure to make a Motion for a downward departure, as Mr. Gormley had expressly requested, as to both the length of incarceration and the restitution amount. See also U.S. v. Exarhos, 135 F.3d 723 (11th Cir. 1998) [Court remands restitution issue for trial court to determine amount defendant could foreseeably make/earn]. U.S. v.

ISSUE #___: Trial counsel was ineff-
ective for failing to notice the jurisdictional
defect in the Indictment caused by the
absence of the essential element for a
"wire fraud" offense of "materiality of
falsehood" from Counts 1 and 3. See
Neder v. U.S., 521 U.S. 1, 25 (1999).
For the full development of this argument,
see pages 18-20 of Mr. Gormley's Motion
for a New Trial, based upon Newly Discov-
ered Evidence. If the Count 1 and 3
wire fraud-related counts are
jurisdictional defective, then the Count 2
and 6 money laundering related counts are
also void, for lack of a predicate
"specified unlawful activity". See
U.S. v. Tencer, 107 F.3d 1120, 1129-30
(5th Cir. 1997); U.S. v. O'Hagan, 92 F.3d
612, 628 (8th Cir. 1996); U.S. v. Brumley,
79 F.3d 1430, 1442 (5th Cir. 1996).
If counsel had properly noticed these
jurisdictional defects in the indictment,
he should have moved to dismiss the
indictment and/or for a directed verdict,
but he failed to do so. What is truly
astounding about Mr. Parker's failure is
that he was actually aware of the Neder
decision in June 1999, shortly after

the Supreme Court decided the case, and months before the November 1999 trial began. See the June 21, 1999 one page fax memo to Ben Bryant, Esq, from Buddy Parker, Esq, about the Neder decision. A copy of that Memo is attached to this issue argument for the Court's convenience of reference.

A review of the trial transcripts reveals that AUSA Philip Wright and Judge Chambers were also well aware of the Neder decision at the time of trial, since they referred to it on the record. Trial Trans. Vol. IX, p. 163. Despite this awareness of Neder, no one seems to have realized that the absence of the element of the new element of "materiality of falsehood" from Counts 1 and 3 of the indictment led to a jurisdictional failure. U.S. v. Hooker, 841 F.2d 1225, 1231-34 (4th Cir. 1988) (en banc); U.S. v. Wicks, 187 F.3d 426, 427-28 (4th Cir. 1999); U.S. v. Daniels, 973 F.2d 272 (4th Cir. 1992). Even the Fourth U.S. Circuit Court of Appeals over-looked the element of "materiality of false-hood" in appraising the sufficiency of the evidence to support Mr. Gormley's wire fraud related convictions. U.S. v. Bollin

264 F. 3d at 407 (4th Cir, 2001).

"To convict Gormley for wire fraud in violation of 18 U.S.C. section 1343, the Government must prove : 1) a scheme to defraud and 2) the use of wire communication in furtherance of that scheme.' U.S.v. ReBrook, 58 F.3d 961, 966 (4th Cir. 1995) (quoting U.S.v. Brandon, 50 F.3d 464, 467 (4th Cir. 1995), see also 18 U.S.C. section 1343."

Yes, even a Federal Circuit Court missed the "new" element of "materiality of falsehood" for wire fraud two years after the Supreme Court decided Neder. The fact that the trial Court actually charged the jury on the element of "materiality of falsehood" (even though it was not in the indictment) does not save the convictions, since such constituted a constructive amendment to the indictment, which is error per se, and must be reversed, even if not preserved by objection. U.S.v. Floresca, 38 F.3d 706, 710 (4th Cir. 1994) (en banc) [citing Stirone v. U.S., 361 U.S. 212, 217 (1960)]. For

the jury charge on "wire fraud", see
the Trial transcripts, Volume XI, PP.
30-31. Thus, this Court must now vacate
the Count 1 and Count 3 convictions as
being jurdictionally defective. Because
the Count 2 and 6 Money laundering conviction
depend upon the validity of the predicate
Wire fraud convictions, they are also
void and must be vacated due to the
jurisdictional invalidity of the wire
fraud related counts, 1 and 3. Because
of the nature of jurisdictional defects,
they can be recognized by the Court at any
point in time. Fed. R. Crim. Pro. 12(b)(2),
U.S.v. Sutton, 961 F.2d 476, 478-79
(4th Cir. 1993); U.S.v. Willis, 992 F.2d
489, 490 (4th Cir. 1993).
       "Trial counsel was also ineffective
for failure to notice the absence of an
essential negative element (an exception
to the general rule) from the indictment (and
from the jury instructions) concerning the
"Safe Harbor" from obstruction of Justice
for attorneys, which is set forth in 18 U.S.C.
section 1515(c): "This Chapter does not
prohibit or punish the providing of bonafide
legal representation services in connection
with or anticipation of an official proceeding

"It is a general ~~rule~~ guide to the interpretation of criminal statutes that when an exception is incorporated into the statute, the burden is on the prosecution to plead and prove that the defendant is not within the exception." U.S. v. Vuitch, 402 U.S. 62, 70 (1971). See also, Hale v. U.S., 89 F. 2d 578, 579 (4th Cir. 1937) (Citing several old Supreme Court cases. Because this was also a jurisdictional defect, this Court must now recognize it, despite counsel's failure to move to dismiss the indictment.

06/21/99   MON 13:43 FAX

# KILPATRICK STOCKTON LLP

Attorneys at Law
Suite 2800
1100 Peachtree Street
Atlanta, Georgia 30309-4530
Telephone: 404.815.6500
Facsimile: 404.815.6555
Web site: www.kilstock.com

E-mail: bparker@kilstock.com
Direct Dial: 404.815.6123

June 21, 1999

--------------------------------------------------- • **Facsimile**

Buddy Parker
FROM

PAGES (WITH COVER)

1376
REFERENCE NUMBER

176691
MATTER NO.

**CONFIDENTIALITY NOTE:**
The information contained in this facsimile message is being transmitted to and is intended for the use of the individual named below. If the reader of this message is not the intended recipient, you are hereby advised that any dissemination, distribution or copy of this facsimile is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and destroy this facsimile message.

S. Benjamin Bryant, Esq.
TO

(304) 345-7250
PHONE NO.

(304) 345-1359
FACSIMILE NO.

King Allen Guthrie & McHugh
COMPANY

Charleston, WV
CITY, STATE, COUNTRY

| PLEASE CALL 404.815.6497 IF YOU HAVE DIFFICULTY WITH THIS TRANSMISSION. |

## Comments •

The Supreme Court recently held in Neder v. United States, ___ S.Ct. ___, 1999 WL 373186, *15 (June 10, 1999), "that materiality of falsehood is an element of the federal mail fraud [18 U.S.C. § 1341], wire fraud [18 U.S.C. § 1343] and bank fraud [18 U.S.C. § 1344] statutes." This holding reverses a contrary ruling by the Eleventh Circuit last year. See United States v. Neder, 136 F.3d 1459 (11th Cir. 1998).

ISSUE # 1

Mr. Gormley's trial counsel was ineffective for failing properly to investigate the case and prepare for trial. See, Kimmelman v. Morrison, 477 U.S. 365, 385-87 (1986). Roach v. Martin, 757 F.2d 1463 (4th Cir. 1985); Hoots v. Allsbrook, 785 F.2d 1214, 1220-21 (4th Cir. 1986) [Failure to even interview available eyewitnesses to a crime simply cannot be ascribed to trial strategy and tactic]. U.S. v. Gray, 878 F.2d 702, 710-11 (3d Cir. 1989). [Failure to investigate witness]

"The effect of counsel's inadequate performance must be evaluated 'in light of the totality of the evidence at trial'; a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming support.' Id. at 696, 104 S.Ct. at 2069. see also, U.S. v. Agurs, 427 U.S. 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976) ("if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt")."

Rios v. Rocha, 299 F.3d 796 (9th Cir, 2002) [Failure to properly investigate the case may constitute ineffective assistance of counsel].

Claims that counsel was ineffective for failing to properly investigate the case and/or prepare for trial require the Court to hold an evidentiary hearing. Townsend v. Sain, 372 U.S. 539, 550 (196 ; U.S. v. DeFusco, 949 F.2d 114, 120-21 (4th Cir, 1991).

In Washington v. Williams, 59 F.3d 673 (7th Cir. 1995) the Court agreed that counsel had been ineffective because he had failed properly to prepare for trial.

In a very recent case, a Court granted the defendant's 2255 Motion for Habea Corpus, where the Court found that: (1) defense counsel was objectively unreasonable in his failure to investigate, interview and call at trial witnesses with evidence in support of defendant's good faith defense, as defendant had request See, U.S. v. Tasin, 215 F.Supp.2d 552 (E.D.Pa, August 8, 2002).

In Mr. Gormley's case, his trial counsel was ineffective because they failed properly to investigate the case and to

prepare for trial.

After reviewing the Government's discovery, which was extensive, lead counsel Buddy Parker decided not to interview any witnesses in preparing for trial, except of course, his client, Mr. Gormley. Mr. Parker did ask Mr. Bryant, local counsel, to speak with West Virginia lawyers involved in Mr. Damron's case; including Jack Laishley, William Levine and Edward Weis, and with Dr. Touma's alleged psychic, Sherry Young. Messrs. Parker and Bryant did not attempt to contact other witness who could have helped Mr. Gormley's case, especially William W. Gardner, an Atlanta attorney who had told Mr. Gormley that foreign bank debenture programs exist and that he had previously represented clients in attempting to invest in them. See Docket Nos. 790 (arbitration transcript) and 798 (Grand Jury transcript). The possible effects and uses of Mr. Gardner's trial testimony are described elsewhere in this Motion and will not be repeated here. Counsel was ineffective for failing to interview Mr. Gardner and call him as a witness at trial, as Mr. Gormley had requested counsel do.

Trial counsel was ineffective in failing

to call attorneys Jack Laishley and Edward
Weis as witnesses at Mr. Gormley's trial,
They both could have provided valuable
testimony in support of Mr. Gormley's theory
of defense, that he had just been practicing
law, not engaging in crime. As attorneys,
both Mr. Weis and Mr. Laishley were qualified
to state whether in their dealings with
Mr. Gormley concerning Mr. Damron they
ever thought that he had exceeded the
bounds of legitimate lawyering. Mr. Weis
later told Mr. Gormley that he was surprised
that counsel had not called him as a witness
Since his testimony would have been favor-
able and supportive.

   Mr. Laishley also could have provided
favorable, supportive testimony on several
issues, including the fact that Mr. Gormley
procured from the Dempsey Law Firm in the
Turks & Caicos Islands the list of invest-
ors being repaid by Stephen Oles, at Mr.
Laishley's express request, and then
provided it to Mr. Laishley knowing that
he intended to turn it over to the Government
Mr. Laishley subpoenaed Mr. Gormley to the
October 23, 1997 Damron Contempt hearing,
where Mr. Gormley turned the list over to
the Court. Mr. Laishley and Mr. Gormley

had several conversations about their mutual client, Roger Damron, which Mr. Laishley could have testified about. Further, Mr. Laishley could have explained how and why he faxed Mr. Gormley on March 24, 1998, a copy of the Court's March 17, 1997 Ex Parte Restraining Order, which was seized during the search of Mr. Gormley's law office in August 1998. He would have testified that he faxed it to Mr. Gormley, at his request, because Mr. Gormley had never previously seen the Order. This could have blunted the effect of Mr. Damron's testimony that he had faxed the Restraining Order to Mr. Gormley on March 17, 1997 (which we now know to be false, because Mr. Damron had not then been served with the Restraining Order himself. Trial counsel was ineffective for failing to call Mr. Laishley as a witness.

Trial counsel failed ever to even interview any member of the Finbar F. Dempsey & Co. law firm in the Turks & Caicos Islands concerning their dealings with the defendant and Mr. Gormley. In particular, attorney Anne M. Phelan could have testified that neither Mr. Gormley nor Mr. Damron directed her to "backdate" to January 1996 Loan

documents she prepared in March 1996, reflecting the loaning of money by Network Developers, LLC, to Pharaoh Corp. Miss Phelan could have testified that the loan documents were actually prepared in March 1996 because she simply forgot to prepare them in January 1996, contemporaneously with the wire transfer, as she had then been instructed. During closing arguments, the Government made a damning argument to the Jury that they should infer that since the documents were not prepared until March, 1996, after Mr. Domra home was searched by the F.B.I, in February 1996, Mr. Gormley had "counselled the creation and back dating of loan document Not only is it not true, but no witness eve testified to that effect either. The Gov. merely argued an inference from the dates on the documents and the transmittal letter from Miss Phelen. The Fourth Circuit even picked up on this "inference." In writing its opinion affirming Mr. Gormley's convictions, U.S. v. Bollin, 264 F.3d 391 (4th Cir. 2001) If trial counsel had properly investigated this case, he would have contacted/ interviewed members of the Dempsey law firm, including Miss Phelan, and could

have obtained Miss Phelan's testimony about how the Loan documents were prepared and why. Such proper investigation and trial preparation could have avoided the horribly damning (but untrue) inference that Mr. Gormley had counseled the backdating of loan documents. Trial counsel's ineffectiveness in this regard severely prejudiced Mr. Gormley and played a significant role in his being convicted.

Trial counsel was also ineffective in failing to interview and call as a witness at trial Mary Stevens of Knoxville, Tenn. She was Mr. Damron's secretary, who handled and kept all of the paperwork about Gold Eagle Club for Mr. Damron.

# FINAL ISSUE, # ___

Even if the Court should not find any single incident of ineffective assistance of counsel to have so prejudiced Mr. Gormley as to justify granting Habeas Corpus, the Court may find that the cumulative effect of counsel's errors does justify granting Habeas Corpus. Taylor V. Kentucky, 56 L.Ed.2d 468 (1978); Hoots V. Allsbrook, 785 F.2d 1214, 1225 (4th Cir. 1986) (Chief Judge Ervin, dissenting) ["The cumulative effect of an attorney's errors may have a devastating effect on the defendant's defense."].

## CONCLUSION,

For the foregoing reasons, and based upon the authorities, Movant requests that the Court grant this Motion for Habeas Corpus.

WHEREFORE, Movant prays that the Court grant him bond, appoint counsel to represen_ him, hold a prompt evidentiary hearing and vacate his convictions and sentence, plus any other relief to which he may be entitled

F.C.I. - Manchester
P.O. Box 4000, Laurel - A
Manchester, Kentucky 4096_

James J. Gormle_
Reg. No. 05787_